## STATE v. HILLSTROM.

No. 2764.    Decided July 3, 1915.    (150 Pac. 935.)

1. CRIMINAL LAW—TRIAL—INFERENCES FROM EVIDENCE--FUNCTION OF JURY. The drawing of inferences from facts in evidence is for the jury. (Page 345.)

2. CRIMINAL LAW—APPEAL—QUESTIONS REVIEWABLE—CREDIBILITY OF WITNESSES. The credibility and weight of the testimony of a witness was for the jury, not for the appellate court. (Page 345.)

3. CRIMINAL LAW—EVIDENCE—ADMISSION—SILENCE OF DEFENDANT. Where defendant, when in custody charged with murder, declined to give the officer any information in regard to the quarrel over a woman in which he claimed to have received a shot through the body, or to make any statement whatever concerning the matter, his refusal to make any such statements in answer to the officer's offer to set him free if he would do so, or his refusal to answer any question, could not be considered as an admission of guilt. (Page 345.)

4. CRIMINAL LAW—EVIDENCE—PRIVILEGE OF ONE ACCUSED OF CRIME. The failure of a defendant in a criminal case to take the stand cannot in any manner prejudice him, or be used against him, but the defendant, without some proof tending to rebut proven facts within his knowledge, may not avoid the natural and usual inferences deducible from them by merely declining to take the stand. (Page 345.)

5. CRIMINAL LAW—TRIAL—REQUISITE PROOF OF GUILT. In a prose-

State v. Hillstrom, 46 Utah 341.

cution for homicide, the state, as in all criminal cases, must prove the defendant guilty beyond a reasonable, doubt. (Page 345.)

6. HOMICIDE—TRIAL—IDENTITY—SUFFICIENCY OF EVIDENCE. In a prosecution for first degree murder, evidence as to the identity of defendant with the victim's assailant *held* sufficient to sustain verdict of guilty.[1] (Page 345.)

7. AMICUS CURIAE—TRIAL—DISCHARGE OF COUNSEL. In a prosecution for homicide, defendant was represented by two counsel of his own selection. When the state was about half through with its case, upon a witness being tendered for cross-examination, the defendant arose, stated that he had three prosecuting attorneys and intended to get rid of two of them, and told his counsel they were fired. After a colloquy, defendant insisting on his right to conduct his own case, the court said he might do so, but appointed defendant's attorneys *amici curiae* to conduct examinations for him and protect his interests. Thereafter both defendant and the attorneys cross-examined witnesses, and such attorneys elicited matter beneficial to defendant. After a noon-hour conference with his friends and the attorneys defendant returned to court and stated he was willing the attorneys should ask questions, and that he himself would also examine the witnesses. Thereafter other counsel came into the case for defendant, and all three attorneys, with defendant's consent, represented him and took part in all proceedings to the end of the trial. Defendant contended that the court erred in appointing his counsel *amici curiae* after he had discharged them, in refusing to allow him to conduct his case in person and alone without counsel, in not taking an adjournment at once after he had discharged his counsel to enable him to procure other counsel, and in proceeding against him without counsel. *Held* that, since the court granted all defendant asked, his right with or without cause to discharge counsel and defend in person, he not having asked for other counsel, or for time to procure them, but in a most unseemly manner, without cause, abruptly demanded the discharge of his counsel when damaging testimony was being elicited against him, the action of the court in appointing such counsel *amici curiae* to protect defendant's interests was entirely proper. (Page 359.)

8. CRIMINAL LAW—EVIDENCE—TESTIMONY ON PRELIMINARY EXAMINATION—STATUTES. Comp. Laws 1907, section 4670, provides that in case of homicide the evidence at the preliminary examina-

[1] *State* v. *Hill*, 44 Utah, 79, 138 Pac. 1149; *State* v. *Mortensen*, 26 Utah, 312, 73 Pac. 562; *State* v. *Sirmay*, 40 Utah, 525, 122 Pac. 748; *State* v. *Inlow*, 44 Utah, 485, 141 Pac. 530; *State* v. *Thorne*, 39 Utah, 208, 117 Pac. 58.

Appeal from Third District.

tion must be reduced to writing as a deposition, and that the transcript of such evidence, properly certified and filed, shall be *prima facie* a correct statement of the testimony; while section 4685x1, provides that it may be used at the trial with the in proceeding against him without counsel. *Held* that, since the same effect as though the witness were testifying, if it be satisfactorily shown to the court that the witness is dead, insane, or cannot with due diligence be found within the state. The transcript of testimony of a physician on preliminary examination was sought to be used at a trial for first degree murder on the ground that he could not with due diligence be found in the state. The officer who had attempted to subpœna him testified that ten days before the trial he had called at the doctor's house, but found him out making a call, but the next time they told him that the witness was going on a trip, and that before he could get him the next time he had left the state. *Held*, that the transcript of the doctor's testimony on preliminary examination was admissible in evidence; due diligence having been shown. (Page 366.)

9. CRIMINAL LAW—EVIDENCE—TESTIMONY ON PRELIMINARY EXAMINATION—STATUTES. Under Comp. Laws 1907, sections 4670, 4685x1, regulating the introduction in evidence on a trial for homicide of the transcript of testimony on preliminary examination of a witness who is dead, insane, or unable to be found within the state by due diligence, where the stenographer's transcript of the proceedings at such examination showed that the defendant was present and was given opportunity to cross-examine a medical witness out of the state at the time of the trial, whose testimony on preliminary examination was sought to be introduced in evidence, such transcript was not inadmissible as denying the defendant an opportunity to cross-examine the witness in the presence of the trial jury. (Page 366.)

10. CRIMINAL LAW—EVIDENCE—TRANSCRIPT ON PRELIMINARY EXAMINATION—STATUTE. Under Comp. Laws 1907, sections, 4670, 4685x1, proving that in cases of homicide the testimony of witnesses on preliminary examination shall be transcribed by a stenographer, certified, and filed, and that such transcript may be used at the trial as evidence if the witness be dead, insane, or not, with due diligence, to be found within the state, such a transcript was not inadmissible because the certificate to the transcript was to the effect that it was transcribed in longhand, while in fact, it was transcribed in typewriting. (Page 366.)

11. HOMICIDE—HARMLESS ERROR—RECEPTION OF INADMISSIBLE TESTIMONY. In a prosecution for homicide, where empty shells and bullets with which the two victims were killed were, without controversy, thirty-eight caliber, and shot from a thirty-eight

caliber automatic pistol, the admission of opinion evidence of a medical witness not properly qualified on the subject that, in his opinion, a wound through one of the bodies was made by a thirty-eight caliber bullet, was harmless. (Page 368.)

12. JURY—TRIAL—EXAMINATION OF VENIREMAN. In a prosecution for homicide, where a venireman testified in response to questions that he presumed defendant was innocent, that the state was required to prove guilt beyond a reasonable doubt, that the jury was the sole judge of guilt or innocence, etc., the action of the court in sustaining objections to questions as to whether the venireman understood he was partly interested in the defendant's side of the case on account of the presumptions of innocence, and whether he understood that a juror is under no obligations to take the opinion of any witness, was not erroneous, since the matter had been covered. (Page 369.)

13. CRIMINAL LAW — TRIAL — INSTRUCTIONS — CREDIBILITY OF WITNESSES. In a prosecution for murder, an instruction that, if the jury believed any witness willfully testified falsely to a material fact, his testimony might be disregarded in whole or in part, except as he might have been corroborated by credible witnesses or evidence in the case, was not erroneous as not correctly guiding the jury as to the rules of law in determining the credibility to be given the testimony of witnesses. (Page 369.)

14. CRIMINAL LAW—TRIAL—INSTRUCTIONS—INSTRUCTIONS SUBSTANTIALLY GIVEN. The refusal of requested charges substantially given is not erroneous. (Page 369.)

15. CRIMINAL LAW—TRIAL—INSTRUCTIONS—CIRCUMSTANCES OF SUSPICION. In a prosecution for homicide, an instruction that circumstances of suspicion, if they amount to no more than suspicion, are not sufficient proof of guilt, was not erroneous as telling the jury that circumstances of suspicion are evidence. (Page 369.)

16. CRIMINAL LAW — INVITED ERROR — REQUESTED CHARGE. Where claimed objectionable language in an instruction was taken from one of defendant's requests, he could not complain. (Page 369.)

Appeal from District Court, Third District; Hon. *M. L. Ritchie*, Judge.

Joseph Hillstrom was convicted of murder. He appeals.

AFFIRMED.

*O. N. Hilton* and *Soren Christensen*, for appellant.

*A. R. Barnes,* Attorney-General, and *E. V. Higgins* and *G. A. Iverson,* Assistant Attorneys-General, for the State.

STRAUP, C. J.

The defendant was convicted of first degree murder and appeals. The principal question presented is that of sufficiency of the evidence. The claim made is that there is not sufficient evidence to identify the defendant, to connect him with the commission of the offense, nor to show motive.

In the information it is charged that he with a revolver shot and killed J. G. Morrison. The deceased was conducting a grocery store at or near the corner of Eighth South and West Temple streets, in Salt Lake City. The store, with a glass front, faced east on West Temple street, running north and south. About half a block to the west is a cross-street known as Jefferson street. Midway between that street and West Temple is an alley. The homicide was committed in the store between nine forty-five and ten o'clock p. m., on the 10th day of January, 1914. With the deceased in the store were his two sons, Arling, about seventeen, and Merlin, about thirteen years of age. The night was a bright, moonlight night. Near the store was an electric arc light. There was another near Jefferson street. The sidewalk and the street near the store were also lighted from brilliant lights in the store. As the deceased and his two sons were preparing to close the store, two men with red bandana handkerchiefs over their faces as masks, and with revolvers in their hands, suddenly entered the store. One of them was tall and slender, and wore a dark, or dark grey, soft hat, and a dark coat and dark trousers. The deceased was near a counter on the north side of the room, moving a sack of potatoes behind the counter. Arling was on the south side, sweeping near a cash register and an ice chest. In the upper part of the chest, from which the door was removed, the deceased kept a loaded, six-chamber, thirty-eight caliber revolver. Merlin, the only living witness to the shooting, testified that as the two assailants entered the store and approached his father they said, "We have got you

now,'' and immediately shot. He gave it as his best judgment that about seven shots in all were fired, when the assailants fled, without attempting to take anything from the cash register or elsewhere. The father and Arling were both killed. The former was shot twice; the latter three times, twice in the back. Later five or six bullets and empty cartridges were found in the store. They all were shot from a thirty-eight caliber automatic revolver. Two bullet marks were found in shelving or the counter where the deceased was killed, another on the inside of the ice chest, where the deceased kept his revolver, and two or three where lay the body of Arling, behind the counter, with one bullet hole through his body and straight down through the floor. Merlin testified he did not see the first shot fired, which hit his father, but saw the second, which was shot by the taller of the two assailants, who then directed his attention towards the ice chest. Merlin retreated into a little storeroom, where he no longer saw Arling nor the assailants, but heard shots. After the assailants had fled, Merlin first went to his father, and then to Arling. He found the latter dead behind the south counter, and but a short distance from the ice chest. Near his outstretched hand lay the revolver which was kept in the ice chest, with one chamber discharged. An officer who examined it shortly thereafter testified that it was freshly discharged. Merlin testified that he saw the revolver in the ice chest earlier that evening, and that then all six chambers were loaded. He testified that he did not see Arling get the gun from the chest, and did not know that he had discharged it until he found it lying on the floor with one chamber discharged. From this it is quite evident that at some perid during the shooting Arling went to the ice chest, got the gun, and discharged it at the assailants.

Another witness whose attention was attracted by the shooting saw the taller of the two assailants come out of the store in a rather stooped position, with his hands drawn over his chest, and heard him exclaim as if in great pain, ''Oh, Bob!'' and saw him cross the street to the alley, where he was joined by two other men. They there halted for a moment and disappeared in the alley. Another witness saw the

taller of the two assailants run from the store into the street
near a pole, there halt, and then go towards the alley, and
heard him in a clear voice say, "I am shot." The next
morning a gob of blood about the size of a quarter spattered
over the sidewalk for a space of about a foot was found at
the entrance of the alley. The blood had the appearance,
as described by the witnesses, as coughed up and spat on the
sidewalk. Similar blood was found down the alley where the
assailants went and were heard to mutter to themselves.

The defendant on the day of the homicide was visiting
with acquaintances by the name of Eselius, at Murray, a
town about five miles south of the place of the homicide. At
that house were Mrs. Eselius, her six brothers, her father,
and one Otto Applequist. Some of them had been working
at the mills or smelters at Murray. On the day of the homi-
cide some of them left Murray about five o'clock p. m. to
attend a theater at Salt Lake City. The defendant and
Applequist remained. They were seen at the Eselius house
as late as six o'clock that evening. They left that evening
some time between six and nine; the exact time is not made to
appear. Applequist did not return, and has not been seen
nor heard of since. That night between eleven thirty and
twelve o'clock the defendant called at a Dr. McHugh's
office, on Fourteenth South and State streets, about
two and one-half miles south of the place of the
homicide, and about midway between the place of
the homicide and Murray. The doctor had just re-
tired. He was called to his office by the defendant ringing
the bell. The doctor was acquainted with him, and had known
him as "Joe Hill." Upon the doctor entering the office
and asking what the trouble was, the defendant replied that
he was shot, and stated: "I wish this kept private." The
doctor removed the defendant's clothes, and found him suf-
fering from a gunshot wound through the chest and lungs.
As the doctor described it: "The bullet entered a little
below and a little to the outer side of the nipple line, ranging
upward, backward and outward, and emerged a little below
the interior angle of the scapula." He found the defend-
ant's undershirt and shirt saturated with blood, and the de-

fendant in a weakened condition, almost ready to collapse from loss of blood. As the doctor was attending the defendant, a Dr. Bird, residing at Murray, passing Dr. McHugh's office, and seeing a light in the office, stopped to see Dr. McHugh on other matters. Dr. Bird also saw the wound. The bullet had gone clear through the defendant's body and clothes and was missing. From the appearance of the wound the doctors gave it as their opinion that the bullet causing the wound was shot from a thirty-eight caliber gun. They further testified that such a wound would cause internal hemorrhages, coughing, and spitting of blood. After the wound was attended the doctors assisted the defendant in dressing. In doing that, a revolver in a holster with shoulder straps fell from the defendant's clothes to the floor. Dr. McHugh picked it up and handed it to the defendant. He put it in his coat pocket. The doctors saw but the handle of the gun sticking out of the holster. From the appearance of the handle they gave it as their opinion that the gun was a thirty-eight caliber automatic gun, and that the handle was similar to a Colt's automatic thirty-eight gun exhibited to them. While the defendant was there at the office he told the doctors that "he had had a quarrel with some one over a woman, and that in the quarrel he was shot, and that he was as much to blame as the other fellow, and wanted it kept quiet, kept private." That was all that was said by him concerning the manner in which he received the wound. That was volunteered by him. The doctors did not ask him anything concerning the place nor the circumstances or particulars under which he received it, nor did the defendant tell them anything further about it. After the wound was dressed and the defendant ready to leave, Dr. McHugh asked Dr. Bird to take the defendant in Dr. Bird's automobile to the Eseliuses. As Dr. Bird and the defendant approached the Eselius place the defendant requested the doctor to turn down the lights of the automobile. Dr. Bird did so. As they neared the house the defendant, "with a combination of the teeth, tongue, and lips, gave two shrill, penetrating whistles." Dr. Bird assisted the defendant to the kitchen or back door. As the defendant and Dr. Bird entered "a num-

ber of men seemed to have just gone from the back room that we first entered into the next room, and all were standing or walking in that direction as we entered the door, and turned and·recognized the defendant, and, seeing him with me, expressed surprise, and asked if he was hurt.'' The doctor assisted the defendant to a cot into an adjoining room, and there left him sitting on the cot. Two or three days after that the defendant was arrested. In his room on a table was found a red bandana handkerchief similar to that worn by the assailants. The defendant's coat and clothing worn by him on the night of the homicide were seized and put in evidence. They were similar in appearance to those worn by the taller assailant. One of the officers asked the defendant where his gun was. He told him that Dr. Bird, on the way from Dr. McHugh's office to the Eseliuses, had trouble with his automobile, and as Dr. Bird got out to crank it, the defendant threw the gun away. No gun was found. The defendant was not a witness in the case, and at no time explained or offered to explain the place where, nor the circumstances under which, he received his wound, except as stated by him to the doctors, that he received it in a quarrel over a woman; nor did he offer any evidence whatever to show his whereabouts or movements on the night of the homicide.

A Mrs. Seeley, living about a block from the deceased's store, testified that she and her husband, returning from uptown just a few minutes prior to the homicide, passed the store and saw the deceased and his two sons in the store. As they crossed Jefferson street they met two men with red bandana handkerchiefs tied around their necks. One of the men was tall and slender. In passing they crowded her off the sidewalk. She turned and looked at them. The taller turned and looked at her. She gave this description of him:

''By the District Attorney: Q. Did this man that turned, the taller of the two, did he look directly at you? A. Yes. Q. And did you look directly at him? A. Yes. Q. Did you notice anything peculiar about the features of the face of the man that turned at that time and looked at you after you had just been crowded off the sidewalk? A. Yes. Q. I wish you would just tell in your own way, Mrs. Seeley, what

there was about the face of that man that attracted you. A. Well, his face was real thin; he had a sharp nose, and rather large nostrils. He had a defection on the side of his face or neck. Q. On the side of the face or neck? A: Right here on his face. Q. What do you mean by that—apparently a scar? A. Yes; it looked as though it might be a scar. Q. And you observed that? A. Yes, sir. * * * Q. Did the nose appear to be particularly sharp that you saw on the tall man there at that time? A. Yes. Q. And the nostrils were peculiar? A. Yes; the gentleman that I met was a sharp-faced man with a real sharp nose, and his nostrils were rather large.''

The witness, after testifying that she saw and observed the defendant shortly after his arrest, was further asked:

''Q. How does the height of the defendant compare with the height of the man that turned and looked at you? A. Very much the same. Q. How does the nose of Mr. Hillstrom compare with the nose of the man you looked at there? A. Very much the same. Q. How do the marks, especially upon the left-hand side of his face and neck, that you have had an opportunity to observe, correspond with the marks on the man that you saw there at that time? A. Well, they look a great deal alike to me, as on the same man that I saw.''

The witness at the preliminary examination and on cross-examination testified that she would not say positively that the defendant was that man, and that she had an honest doubt as to whether they were the same person.

Merlin testified that the size of the defendant was similar to that of the tall man who entered the store, but he, too, would not testify that it was the same man. The witnesses who saw the taller of the two men run out of the store and to the alley, and heard him exclaim, ''Oh, Bob!'' and ''I am shot,'' testified that they saw the defendant shortly after his arrest and heard him talk, and that his appearance and voice were similar to that man. One of them testified that he was ''exactly the same.''

When the defendant stood erect with his coat on and his arms down the bullet hole where the bullet entered the coat

was four inches lower than the wound where the bullet entered his body. From this it is argued by defendant's counsel that the defendant received the shot causing his wound when his hand and arm were raised above his head drawing his coat up, and that the arms of the assailant in the store were at no time in such a position, and therefore the defendant's wound was not received in the store. Such argument does not demonstrate that the defendant was not the man who was shot in the store by Arling. At most, it is but an inference of fact, which, and the weight of it, were for the jury. That Arling shot one of the assailants in the store is sufficiently shown; indeed, that fact is not seriously controverted. But no one at that moment saw either the assailant or Arling. In what position Arling was when he shot or the assailant when he received the shot is not disclosed. Counsel, in oral argument, told us that that was very clearly shown; but the record does not support the contention. It clearly and without dispute supports the contrary. As already shown, the only living witness to the homicide was Merlin. When the second shot was fired at the deceased, and the assailant directed his attention towards the ice chest, Merlin retreated to the storeroom. Shots were fired after that, but he while in the storeroom could not see either Arling or the assailants, and did not know that Arling had taken the gun from the ice chest or had discharged it until the assailants had fled. Thus counsel base a positive conclusion upon nonexisting premises, at least upon premises wholly conjectural and speculative—the position the assailant or Arling was in at the time the former was shot. The argument that the defendant, if he was one of the assailants, must, when he was shot, have been in the middle of the room with his hands raised above his head, is not the only deducible inference. It is shown that when the assailants entered the store Arling was sweeping near the ice chest, in which lay the deceased's revolver. On the record, when the assailants entered and began shooting the deceased, it can be inferred that Arling rushed to the ice chest for the revolver, and as he reached for it he either was shot, or was shot at, for one bullet mark was found on the inside of the chest where was the revolver.

It can further be inferred that he got the revolver and ran or fell behind the counter where his dead body and gun were found, a short distance from the chest. One bullet hole was clear through his body and straight down through the floor, showing that the assailant, when he fired that shot, leaned or reached over the counter while Arling was down on the floor behind the counter. It also can be inferred that Arling may have shot the assailant as the latter was leaning and reaching over the counter, which position would account for the upraised arm and coat of the defendant and the course the bullet took through his coat and body. That, of course, is but an inference, but it is as probable as the argument of counsel that the defendant, when he was shot, must have had his hands in the air above his head. Then, too, much depends upon the cut and fit of the defendant's coat. Some coats are so cut and fit at the armpit that to raise the arm does not much disturb the body of the coat. Other coats are so cut and fit that to raise the arm draws the body of an unbuttoned coat up very materially, even though the outstretched hand is raised but level with the face. Then the defendant at the time he was shot might have been in a stooping or crouching position with his arm raised, or, seeing the gun in the hands of Arling, might instinctively have thrown his arm and hand up as the shot was fired. Other instances and positions may be conceived to account for the bullet hole in the coat four inches lower than the wound where the bullet entered the defendant's body. But all this is mere matter of inference and argument, and was for the jury.

It further is claimed that no bullet shot from the deceased's gun was found in the store, and that all the bullets which were found were fired from the guns of the assailants, from which, and from the further fact that the bullet which produced the defendant's wound went clear through his body, it is argued that it was not the defendant, but another, who was shot in the store by Arling, and who was not shot through the body, but carried away the bullet lodged somewhere in his body. These also are positive conclusions based on but conjectural or speculative premises, arguing things certain

from other things uncertain. Such argument is proper enough addressed to a jury; but it has no foundation when addressed to a court to conclusively overcome and repel all other facts and circumstances tending to point to the defendant as the perpetrator of the crime.

Evidence also was given to show that the red bandana handkerchief found in the defendant's room at the time of his arrest was given him by Mrs. Eselius the next morning after the defendant was shot, and that he was not possessed of it on the night of the homicide. Mrs. Eselius testified to that. The credibility and weight of her testimony were for the jury, not for us.

The state produced a witness who shortly after the homicide examined the gun found by the body of Arling, and who testified that, in his opinion, the gun was discharged within an hour prior to the time he examined it. The defendant produced a witness who testified:

"It would be impossible to tell with any degree of accuracy when a cartridge in a revolver was exploded."

It is argued that the defendant's witness showed greater knowledge of, and more familiarity with, the subject. Again, that was mere weight for the jury. We think it of little consequence, for, as already observed, we think there is ample evidence to show that one of the assailants was shot in the store by Arling, and that he shot him with the gun found by Arling's body.

Evidence was also given to show that about four blocks west of the place of the homicide dog tracks stained with blood were found the next morning, which, when followed up, led to a dog with a sore foot; but that was not connected in any manner with the blood found on the sidewalk and in the alley near the place of the homicide, and was wholly different from the spatter of blood found on the sidewalk.

Further evidence was given to show that the deceased prior to his engaging in the grocery business was a member of the police force, and "that all the revolvers on the police department have six chambers; they are loaded with five cartridges,

Vol. 46—23

and the sixth one is empty, and the hammer rests on the sixth chamber.'' This and the testimony of the witness that it, could not be told when a cartridge was exploded were offered to show that the gun found near Arling was not discharged by him, and hence that neither of the assailants was shot. The probative effect of that was for the jury. It cannot, as matter of law, be said to overcome and to conclusively repel all the other evidence showing that just prior to the homicide all the chambers of the gun were loaded, that immediately thereafter the gun was found on the floor, not with an empty chamber but a chamber containing an exploded cartridge, and other evidence showing that Arling with that gun shot one of the assailants in the store.

Another witness testified that at about eleven thirty o'clock on the night of the homicide he saw two men about eight blocks .(more than a mile) west of the place of the homicide, one taller than the other, and as he approached them, a block or more away, he saw the taller fall or lie down on the ground. The witness testified that he walked up to him, and saw him lying on his side moaning and groaning, with his head raised on his elbow. The witness observed him but a moment, and without saying anything to him walked away. The man on the ground arose and followed him for a block, where the witness saw him board a street car. The conductor of the street car testified that a tall man, "acting suspiciously," at that time and at that place boarded the car. The conductor thought he was drunk. He rode with him uptown, and there left the car. Both witnesses testified that that man was not the defendant. This was offered to show that that man was suffering from a gunshot wound, and that he was the man who was short in the store by Arling. The testimony has little relevancy. No one claimed that that man was the defendant; nor was it claimed that the defendant that night was in that neighborhood. The state claimed, and produced evidence to support the claim, that the defendant then was at or near the doctor's office on Fourteenth South receiving attention for a serious gunshot wound. Testimony that on that night after the homicide one answering the description of one of the assailants in the store was found at Eighth West street suffering

from a gunshot wound would have had probative effect; but the defendant did not prove that the man seen at Eighth West street was suffering from a gunshot wound, or any wound. That a man, after the homicide, was seen a mile or more from the place of the homicide, moaning and groaning on the ground and appearing to be drunk, and, acting strangely, boarded a street car, proves little, if anything. Sufferers may moan and groan from gunshot wounds. But all who moan and groan are not shot.

But the claim of insufficiency of the evidence is chiefly based on the fact that none of the witnesses who saw the assailant at or about the store on the night of the homicide testified positively that the defendant was one of them; and for that reason it is argued that the case is no stronger than the case of *State* v. *Hill*, 44 Utah, 79, 138 Pac. 1149, where the evidence was held insufficient to connect the accused with the commission of that offense. We think the cases on the facts dissimilar. The testimony of Merlin that one of the perpetrators of the crime was about the same size as that of the defendant, had about the same shaped head, and wore about the same clothes as were shown the defendant wore that night is alone not sufficient. But there is the testimony of the witnesses who saw the taller of the two assailants, in size answering the description of the defendant, run out of the store, heard his voice, and that the voice, size, and appearance of that man were similar to those of the defendant. Though it be conceded that that also was insufficient, still there is the further testimony of the witness who but a few minutes prior to the homicide, close to one of the assailants, in a bright light nearly as light as day, looked him directly in the face. Her attention was particularly attracted to him because of the incident crowding her off the sidewalk. That man and the defendant, as testified to by her, were similar in size and features, had the same slim face, sharp nose, and large nostrils, and the same ''defection'' or scar on the side of the face and neck. True, that witness would not testify positively that the defendant was that man; but the facts testified to by her as to the description of that man pointed most strikingly to the defendant, and may be entitled to as much or more weight than had the witness, without

such description, but testified that, in her opinion or judgment, the defendant was that man. In addition to all this was the fresh bullet wound on the defendant. That wound, unexplained, or unsatisfactorily explained by him, was, in connection with other evidence that one of the perpetrators of the crime answering the defendant's description was shot in the store, a relevant mark of identification, especially in light of the defendant's effort to have the fact of his wound concealed, and in view of his statement that he threw his gun away, of his request that the lights of the automobile be turned down, and of no apparent good reason for his giving two sharp penetrating whistles before he entered the Eselius house with Dr. Bird. Gunshot wounds such as had the defendant are unusual and extraordinary. Under all the circumstances the defendant's wound, unexplained, was quite as much a distinguishing mark as though one of the assailants in the assault had one of his ears chopped off. The only explanation the defendant gave of his wound was that he received it at some undisclosed place in a quarrel with some undescribed man over some undescribed woman, in which he "was to blame as much as the other fellow." With other evidence in the case, that unexplained or unsatisfactorily explained wound might, to the triers of facts, point with as much certainty to the defendant as one of the perpetrators of the offense as though that night at eleven-thirty or twelve o'clock some stolen and identified article from the store had been found in his unexplained or unsatisfactorily explained possession. One suffering from such a wound as did the defendant—a wound of such serious and oft-fatal consequences—ordinarily does not walk around the country seeking surgical aid until, from loss of blood, he is about to collapse. Generally such aid is promptly summoned and brought to such a sufferer. The defendant himself, in the cross-examination of one of the state's witnesses, an officer, brought out the fact that the officer after the defendant's arrest stated to him that, if the defendant would tell him the place where and the circumstances under which he received his wound, so that the officer could investigate the facts in such respect, and if true that the defendant received his wound in a quarrel over a woman, he

would be given his liberty.  The defendant declined to give the officer any information, or to make any statement whatever respecting such matter, except that he threw his gun away as Dr. Bird was taking him from Dr. McHugh's office to the Eseliuses.  The defendant, of course, was not required to make any statement to the officer.  His refusal to make any or to answer any question cannot, though the fact was brought out by the defendant, be considered as an admission of guilt. He had a right to remain silent.  Nor can his neglect or refusal to be a witness in any manner prejudice him or be used against him.  The state, as in all other criminal cases, was required to prove the defendant's guilt beyond a reasonable doubt.  But the defendant, without some proof tending to rebut them, may not avoid the natural and reasonable inferences deducible from proven facts by merely declining to take the stand or remaining silent.  If in case of larceny the theft and the unexplained or unsatisfactorily explained recent possession of the stolen property on the accused are shown, he may not avoid the natural inference deducible from such facts that he is the thief by remaining silent or staying off the stand, and offering no proof to rebut such inference.  Here-the commission of the offense is proved beyond all doubt.  That is conceded.  Other facts also are shown from which natural and reasonable inferences arise that the defendant was one of, and the active, perpetrator of the offense.  The probative effect of them and the natural and reasonable inferences deducible from them cannot be avoided by the defendant remaining silent or refusing to take the stand and offering no proof to rebut them.  While the proven facts and inferences against him are neither strengthened nor weakened by his mere silence or failure to take the stand, yet when he, with peculiar knowledge of facts remains silent, or has evidence in his power by which he may repel or rebut such proven facts and inferences, and chooses not to avail himself of it, he must suffer the consequences of whatever the facts and inferences adduced against him tend fairly and reasonably to prove.

We think the evidence sufficient to justify a finding that the defendant was one of the perpetrators of the crime.  To hold otherwise is to hold that the accused must be identified or con-

nected with the commission of the offense by direct testimony of eyewitnesses who unerringly are able to testify positively and unequivocally that he was the perpetrator. There are many instances where the proof of identity rested wholly on circumstantial evidence, as was the case in *State* v. *Mortensen,* 26 Utah, 312, 73 Pac. 562, 633; *State* v. *Sirmay,* 40 Utah, 525, 122 Pac. 748; *State* v. *Inlow,* 44 Utah, 485, 141 Pac. 530. Here there is testimony of eyewitnesses and circumstances pointing to the identity of the defendant. Against that evidence to hold that there is no evidence to connect him with the commission of the offense is to ignore the record. To do what counsel, both by brief and in oral argument, in effect have asked us to do, place ourselves in the jury box, weigh the evidence, determine the credibility of witnesses, consider their opportunity and means of observation, and the reliability and worthiness of their testimony, is to ignore the law and to usurp a function not possessed by us. And yet the import of their argument, especially the oral argument, is on mere weight and worthiness of testimony, arguments such as the witnesses had not positively identified the defendant and had not sufficient means or opportunity of observing and giving a reliable description of the assailants; that of discrepancies as to the description of the hat and clothes worn by one of them; that the defendant was not shot in the store, because the bullet hole in his coat was four inches lower than the wound on his body, and because no bullet shot from the gun near the outstretched hand of Arling's body was found; that because of the custom of police officers to carry guns with the hammer resting on an empty chamber, and because of the testimony of the defendant's witness that it could not with accuracy be told when an empty cartridge was exploded, the gun found near Arling's body was not discharged by him; that the blood found on the sidewalk and in the alley was from a dog; that the man found moaning and groaning at Eighth West street was the man shot by Arling; that the handkerchief found in defendant's room was given him the day after he was shot; and that no motive was shown for the defendant to mask himself and with gun in hand to enter the store and shoot to death his victim, with whom it was not shown he had any acquaintance. All

this, it is contended, when properly considered and weighed, so clearly repelled whatever testimony there may be to point to the defendant's guilt as to leave no evidence to connect him with the commission of the offense. It is apparent all this was for the jury.

With this conclusion it is unnecessary to inquire into the question of motive. From the proven facts of the homicide it is clear the assailants entered the store to commit murder or robbery. It is immaterial which view is taken of that. *State* v. *Thorne*, 39 Utah, 208, 117 Pac. 58. Since the evidence is sufficient to show that the defendant was one of the perpetrators who, with his face masked and gun in hand, entered the store and deliberately shot his victim to death, it is immaterial to inquire whether the motive was assassination or robbery. Nothing but a wicked motive emanating from a depraved and malignant heart is attributable to the commission of such a crime as is here indisputably shown.

The defendant was represented by two counsel of his own selection and hire. When the state was about half through with its side of the case, and at the conclusion of the direct examination of a chemist by whom it was shown      7 that the blood found on the sidewalk was of mammalian origin, and upon the witness being tendered for cross-examination, the defendant, without any warning to his counsel, and to their complete surprise, arose and addressed the court:

"May I say a few words?

"The Court: You have a right to be heard in your own behalf.

"The Defendant: I have three prosecuting attorneys here, and I intend to get rid of two of them."

Addressing his counsel, he said to them:

"You sit over there, you are fired, too, see. And there is something I don't understand—

"The Court (interrupting): You need not carry out in detail any difference you may have with counsel if any.

"Defendant: I wish to announce I have discharged my counsel, my two lawyers.

"His Counsel: If you have discharged us, that is all there is to it.

"The Defendant: If the court will permit, I will act as my own attorney after this, and cross-examine all the witnesses, and I think I will make a good job of it. As far as the district attorney is concerned, I think we will get along fine; he comes right out in the middle of the road. I know where he is at. These fellows here (his counsel), I think I can get along very nicely without them; they are dismissed. Can I act as my own attorney in this case, and cross-examine all the witnesses, and will I have the right to withdraw any witness who has been on the stand here? Bring buckets of blood for all I care, I intend to prove a whole lot of things here; I will prove these records here of the preliminary hearing are the rankest kind of fake. That is what I will prove. And I will prove a whole lot of other things. I will prove that I was not at that store—"

The district attorney interrupted, and suggested that the defendant at the proper time would have an opportunity to make a full statement. Further colloquy followed, when the district attorney, addressing the defendant, stated:

"I will pause a moment and give you an opportunity to cross-examine" the witness.

Counsel for defendant stated that before they retired they desired to say that they had no difference whatever with the defendant, and that his action was entirely unexpected. The court stated:

"I think until further order counsel who have been representing the defendant may proceed. If the court is satisfied that the defendant really knows his own mind, of course, he has a right to discharge his counsel if he prefers to do that" —and requested counsel to proceed with the cross-examination.

"The Defendant: Haven't I a right to discharge my own counsel?

"The Court: The court will make due inquiry into that, Mr. Hillstrom; and if the court is convinced that you really mean what you say, the court will accord you that right."

The defendant replied:

"I mean what I say."

"The Court: At present counsel may proceed; the defendant may also cross-examine this witness if he desires.

"The Defendant: Without my permission?"

The court thereupon directed the defendant to be seated, and said to him:

"The court will give you an opportunity if you want to cross-examine this witness after counsel who have been representing you have concluded."

Defendant stated the witness was a scientific man and needed no cross-examination, and that "he wouldn't tell anything but the truth." When one of the defendant's counsel began the cross-examination, the defendant, addressing counsel, stated:

"I told you to get out of that door.

"His Counsel: I am acting under the court's instruction; I think you are a little beside yourself at present.

"The Defendant: I am the defendant in this case; I have got something to say.

"His Counsel: I will talk with you later."

Thereupon one of his counsel cross-examined the witness, and then the witness was cross-examined by the defendant himself. At the conclusion of that examination the court again requested counsel to remain—"for the present at least, and to use your best efforts for the protection of the defendant's interest. You at least will have the status of *amici curiae,* and that the defendant also will have the right to cross-examine or examine witnesses, and to take any part in the trial that a defendant may under the Constitution.

"Counsel for Defendant: From the defendant's statement he apparently was under the impression that we were representing the state as well as the district attorney. We trust the court has not observed any such indication."

The court and district attorney both replied that they had not.

When another witness was called, Mrs. Seeley, and on being examined by the state, and defendant's counsel indicating some hesitation in making an objection to a question propounded by the district attorney, the court remarked that he wished counsel to make any objection they thought proper, and

to safeguard the interests of the defendant, and then observed:

"I think the status better be made definite ·if counsel do not understand it.

"The Defendant: Am I recognized as my own attorney here?"

"The Court: I will hear from you.

"The Defendant: My counsel seem to be very insistent upon holding their job.

"The Court: The court is going to look into that matter in a moment.

"The Defendant: I wish you would."

Thereupon the jury was directed to retire. After it retired the defendant said:

"There are some packages here; I would like to take charge of them; they belong to the defense and are paid for. * * * My counsel is discharged. I think I have the right to take these. * * * I have friends right here to take charge of them now."

The court told him that he had the right to take charge of them, and that he had the right to discharge his counsel. Upon inquiry from the court as to the defendant's mental condition, counsel for the defendant stated that they had not observed any evidences of insanity, except his recent conduct in court, and at no time thought that he was insane; that he for some reason unknown to them grew suspicious of, and lost confidence in them, and thought they were in collusion with the state. The district attorney intimated that the defendant's conduct looked like "a frame-up" to raise an issue of insanity. Defendant's counsel assured him that the defendant's conduct was as unexpected to them as to him, and that no defense of insanity was at any time discussed or thought of; that they had not intended, and did not intend, to present any such issue, and had not heard or observed anything to indicate that the defendant was insane.

"The Defendant: There won't be no insanity pleas; I assure you of that; no brainstorm either.

"The Court (addressing the defendant): The court wishes to ask you, in view of the statement you have just made, you

realize it is a remarkable proceeding, at least to get up in the midst of a trial and discharge your counsel?

"The Defendant: Yes, sir.

"The Court: You realize that if there is not sufficient reason for discharging them, that it would be quite difficult to get other counsel to go on with the case at this time; you know that, do you not?

"The Defendant: I will act as my own counsel, and I am going to win this case without counsel."

Upon request of defendant's counsel, the court granted an intermission to enable them to confer with the defendant and his friends. After such conference the defendant and his counsel returned in court. The latter, addressing the court:

"Under the situation, we will proceed to act in behalf of the defendant on the court's appointment, unless the court chooses to appoint some one else in our place. If the defendant wishes some other attorney appointed, we will cheerfully withdraw.

"The Court (addressing the defendant): According to the best information the court has, and after affording you an opportunity to consult so as to protect your rights, I see no reason, at present, at least, why the proceedings should not continue.

"The District Attorney: If I understand, the defendant now consents that counsel continue to represent him.

"Defendant: I want the court to understand that my position is final. I do not object to counsel remaining in the court room; it is none of my business; anybody can remain.

"The Court: I understand you do not object to their asking questions, under the direction of the court, providing you have an opportunity to examine witnesses yourself; is that your attitude?

"The Defendant: Yes; I will examine the witnesses; if they want to also they can go ahead."

Thereupon the jury were recalled and the trial resumed but a short time when the regular adjournment was taken for the noon hour, and before the examination of the witness Seeley was concluded. When the court convened in the afternoon, additional counsel appeared and asked that his name, at the

request of the defendant and of his friends, and at the special request by wire of an attorney at Denver, be entered as counsel for the defendant. His name was entered, and from thence on all three counsel, with the defendant's consent, represented him, and took part in all of the proceedings to the end of the trial. Such additional counsel and the attorney from Denver have prosecuted the appeal for the defendant.

From all this it is claimed that the court erred in appointing defendant's counsel as *amici curiae* after the defendant had discharged them; in refusing the defendant permission to conduct his case in person and alone without counsel; in not taking an adjournment at once after the defendant had discharged his counsel, to enable him to procure other counsel; and in proceeding against the defendant without counsel. Let it be conceded that the defendant with or without cause had the right to discharge counsel of his own selection and hire, and to defend in person. That was all he asked; that the court granted. He did not ask for other counsel, nor time to procure other counsel; but in a most unseemly manner, wholly without cause, abruptly demanded that his counsel be summarily discharged, and that he be permitted to conduct his case in person. The court granted everything the defendant asked, except the court requested his counsel, as friends of the court, to remain, and in every way protect and safeguard the rights of the defendant. That was for his benefit. It is not claimed that his counsel had been disloyal or unfaithful to him, nor is it made to appear that they had not done all that was proper and competent to be done in defending him. He summarily discharged them just before and in the midst of the examination of one of the most important witnesses for the state—the examination of Mrs. Seeley. With such damaging testimony being elicited against him, to have permitted the defendant to stumble along without assistance of counsel, though that was what he demanded, would have been almost cruel. The cross-examination which counsel conducted for him induced the witness to say that, notwithstanding the marked similarity between the defendant and the man she saw at the store just a few moments before the homicide, she nevertheless had an honest doubt as to whether the defendant was

that man, and not to testify positively that the man she saw was the defendant. Counsel, in the cross-examination of the state's witnesses, in nearly every instance elicited something of more or less benefit to the defendant, and were alert with objections to all doubtful testimony and questions proffered and propounded by the district attorney. They were familiar with the case, and, as they informed the court when the defendant asked for their discharge, believed in his innocence. That they were loyal to the defendant is not here disputed. Still the defendant had a right to discharge them. After their discharge they no longer could bind him with anything they did or said until after the noon hour, when they, in effect, were re-employed, or re-engaged. When the defendant, in the forenoon, discharged his counsel and demanded that he be permitted to conduct his case in person, the court was required to let him do that alone as he demanded, in which instance, in a case where the defendant's life was at stake, the court would have felt itself obligated to interpose on its own motion all proper objections for him, and to protect him against all improper and irrelevant proceedings, or to appoint counsel as friends of the court to safeguard and protect the defendant's interests. The court, in its discretion, did the latter. True, it appointed the very counsel the defendant had discharged. But the court appointed those whom it believed, because of their familiarity with the case, their loyalty to the defendant, their belief in his innocence, their proper conduct of his defense, could best serve the defendant, and best protect and safeguard his interests. The court may have thought they were in better position to do that than new counsel to be called in. We think the court took the proper and most commendable course. The defendant's conduct in the presence of the court and the jury so abruptly discharging his counsel was so strange and uncalled for, so groundless and senseless, as to cause the court to make inquiry as to his mental condition. Finding nothing to justify a judicial inquiry as to the defendant's insanity or the conclusion that he was irrational, every one disclaiming that, the court, for the benefit of the defendant, appointed his discharged counsel as friends of the court to safeguard his inter-

ests. Though it should be thought it was not proper for the court to permit counsel after their discharge and until reengaged by the defendant to participate in the proceedings in the manner and for the purpose indicated, still, on the record, it is manifest that the defendant, with the assistance of such counsel, was benefited and not harmed. Under all the circumstances, the argument in one breath that the defendant was denied his constitutional right to appear and defend in person, and in the next was proceeded against without counsel, is as groundless as was senseless the defendant's action discharging his counsel in the forenoon and re-employing, or reengaging, them in the afternoon.

A witness, a physician at Salt Lake City, produced by the state at the preliminary examination, there testified concerning the gunshot wounds found on the deceased, the course of the bullets, and the cause of death, and expressed an opinion that the wounds were produced by bullets shot from a thirty-eight caliber gun. The statute (Comp. Laws 1907, section 4670) provides that in case of homicide **8, 9, 10** the testimony at the preliminary examination of each witness must be reduced to writing, as a deposition by the magistrate, or under his direction, and that the magistrate, with the consent of the county attorney, may order the testimony and proceedings to be taken in shorthand, and for that purpose permits the magistrate to appoint a stenographer who, if the defendant be held to answer, is required, within ten days thereafter, to transcribe his notes in longhand, and to certify and file the transcript with the county clerk. The statute further provides that the transcript so certified to and filed "shall be *prima facie* a correct statement of such testimony and proceedings," and (section 4685x1) may be "used * * * at the trial * * * with the same force and effect" as though the witness were present in court and testifying, provided that it be satisfactorily shown to the court that the witness is dead or insane, "or cannot with due diligence be found within the state." The trial began on the 10th of June, 1914. About the 1st of June subpoenas were issued by the state, among them a subpoena for the physician. The officer in whose hands the subpoenas

were placed for service testified that he, on the 1st or 3d of June, called at the doctor's house to serve him, but found him out making a call, and that "the next time I went, they told me that he was going to go on a trip, and before I could get him the next time he had gone, left the state before I had subpoenaed him." On the 14th of June, and at the trial, the transcript of the physician's testimony was offered in evidence by the state. It was made to appear that the witness then was out of the state and in California, and had been in California since about the 3d or 4th of June. It was not made to appear when he would return, or when he was expected to return. The transcript of the testimony was received over the defendant's objections that due diligence had not been used to subpoena the witness before he departed; that to admit the transcript was to deny the defendant "an opportunity to cross-examine the witness in the presence of this jury"; and that the certificate of the stenographer "did not agree with the testimony given, the certificate being that it was transcribed in longhand, and the evidence being to the contrary effect." Just what is meant by this is not clear, unless that the notes were transcribed in typewriting, and not in "longhand." In addition to these objections, it also here is urged that it was not shown that the testimony at the preliminary examintaion was taken in the presence of the defendant; that he in person, or by counsel, cross-examined the witness, or had an opportunity to do so; and that the testimony was not taken by an "official court stenographer." We do not see anything to any of these objections. The stenographer was called, and testified that he stenographically reported all the testimony given and proceedings had at the preliminary examination, transcribed his notes in typewriting, certified to the transcript, and filed it with the clerk of the court as by the statute provided, and that his transcript was correct. The transcript shows that the stenographer was appointed and sworn by the magistrate to stenographically report all the testimony and proceedings, and that the testimony of the physician, as well as all other testimony, was given, and that all proceedings were had in the presence of the defendant, and that he was given full opportunity to cross-examine that wit-

ness, as well as all other witnesses. That the witness before the trial began and at the time the transcript of his testimony was offered was not within the state, and was in California, is not controverted. The only claim made in such respect is that proper diligence was not used to subpoena the witness before he left the state. The court found due diligence was used. We see nothing to justify a different finding, and think the objections were properly overruled. Further, the things shown by the transcript of the testimony of that witness were all shown by other witnesses present and testifying, and were things not disputed nor controverted by any evidence.

The physician, after he had described the wounds found on the deceased's body, was asked:

"Are you able to state with what kind of a bullet that wound was made, judging from the appearance of the wound?"

He answered:

"I passed on it at the time; it was a thirty-eight; that was my opinion."

When the transcript of his testimony was read, an objection was made to the question and answer on the ground that it was not shown that the witness possessed sufficient knowledge to express an opinion on such a subject. Here the further ground is urged "that expert testimony must not be offered on matters of fact of common knowledge." This is of but little moment, for the empty shells and bullets found in the store with which the deceased and his son were shot and killed confessedly, and without any controversy whatever, were shells and bullets of thirty-eight caliber, and were shot from a thirty-eight caliber automatic gun.

Complaint is made of the court's refusal to permit answers to certain questions propounded by defendant's counsel to a venireman on *voir dire*. Great latitude was given counsel in the examination of the venireman. After he had repeatedly answered, in response to questions put to him in different forms, that he presumed the defendant innocent, that the state was required to prove his guilt beyond a reasonable doubt, that the jury was the sole judge of the guilt or

innocence of the defendant, and that, if he was accepted **12** as a juror, he would acquit him, if there was any uncertainty or doubt as to the defendant's guilt, and that he would not convict him if the state had not proved him guilty beyond a reasonable doubt and the fact that the defendant remained silent and refused to testify would not make any difference, he was asked, "Do you understand you are particularly interested in the defendant's side of this case on account of the lawful presumption of the defendant's innocence?" and "You understand, do you not, that a juror is under no obligation to take the opinion of any witness?" Objections were sustained to these questions. Complaint is made of the rulings. We see no error in this. The defendant was permitted to fully examine the venireman as to all these matters; and, further, the venireman was not accepted as a juror, but was peremptorily challenged by the defendant, who then had ten peremptory challenges left.

The court charged the jury:

"If you believe any witness has willfully testified falsely as to any material facts in this case, you are at liberty to disregard the whole or any part of the testimony **13** of such witness, except as he may have been corroborated by credible witnesses or credible evidence in the case."

Complaint is made of this. It is urged that, "standing alone, it is not the proper instruction," because the jury were not correctly guided as to "rules of law in determining the credibility to be given to the testimony of the witnesses." A similar charge was before us in the case of *State* v. *Morris*, 40 Utah 431, 122 Pac. 380. What we there said answers, as we think, all the objections here made.

The defendant requested six instructions on circumstantial evidence. Complaint is made because they were not given as requested. A comparison of the charge and the requests shows that the substance of them was **14, 15, 16** given. The court gave two paragraphs on the subject, and therein stated all that was necessary to be said. In one of them the court used this language:

"You are instructed that circumstances of suspicion, if

they amount to no more than suspicion, are not sufficient proof of guilt. In order to convict the defendant upon circumstantial evidence, it is necessary, not only that all the circumstances concur to show that he committed the crime charged, but that they are inconsistent with any other reasonable conclusions. It is not sufficient that the circumstances proven coincide with, account for or render probable merely that he is guilty, but they must exclude beyond a reasonable doubt every other conclusion but that of the guilt of the defendant."

Complaint is made of the first sentence. The criticism made of it is that the court by that language told the jury that "circumstances of suspicion" was evidence. We do not think the charge open to that. Besides, the claimed objectionable language was language taken from one of the defendant's requests, and hence, if erroneous, was error of the defendant's own creation.

Thus on a review of the record we are satisfied that there is sufficient evidence to support the verdict; that the record is free from error; and that the defendant had a fair and impartial trial, in which he was granted every right and privilege vouchsafed by the law.

Hence does it follow that the judgment of the court below must be affirmed. Such is the order.

FRICK, J. I concur. It may, however, not be improper for me to add a few words regarding appellant's contention that this case should be controlled by the decision in *State* v. *Hill*, 44 Utah 79; 138 Pac. 1149, where we held that the evidence, as a matter of law, was insufficient to sustain the verdict of the jury. The inferences that the jury were authorized to deduce from the uncontroverted facts in this case clearly distinguish it from the Hill case. Had there been conclusive evidence in the Hill case that Hill was shot through the body with a revolver, and it was further shown that the revolver in question had been in the hands of the deceased in that case, and no explanation had been made regarding the wound in Hill's body other than that vouchsafed in this case, there would be at least some similarity between the cases. In such

event, however, the decision in the Hill case would have been different. Moreover, the evidence of identification in the Hill case was wholly different in its legal effect from that in this case. While it is true that the witnesses in the Hill case stated that the person they saw before and about the time of the homicide resembled Hill in size and build, yet in every instance when these witnesses undertook to describe the person they claimed they saw, they described a person other than Hill. The latter statements thus clearly neutralized the prior identifying statements of the witnesses, and thus left Hill wholly unidentified as the person who was supposed to be implicated in the homicide with the slayer who was killed in the saloon, and who it was shown killed the officer. In view of the uncontroverted facts in this case, the jury were justified in entirely ignoring the claim made to the doctor by the appellant that he was shot elsewhere than in the store where the homicide occurred. The all-important facts that appellant was shot through the body by some one, that he was shot about the time and, as all the circumstances show, at the place where the homicide occurred, and that no one discovered or heard of any other shooting occurring on the night of the homicide except at the Morrison store are all unquestioned.

From the foregoing facts, when considered in connection with the other identifying evidence and circumstances, the jury were authorized to conclude—indeed, it is not easy to perceive how rational men could have arrived at any other conclusion—that the appellant was, in fact, shot in Morrison's store at the time of the homicide. The fact that appellant was not required to take the stand and testify in his own behalf, as pointed out by Mr. Chief Justice STRAUP, cannot affect the inferences that naturally spring from the uncontroverted facts and circumstances. The jury had a right to assume that, even though the appellant wanted to shield some one from disgrace, if nothing more, and was unwilling to disclose who shot him, yet the public generally had no such interest to shield any one, and for that reason, if the shooting mentioned by the appellant had, in fact, occurred, some one would have discovered the fact, if not the cause, and would have made it known before the trial. The shooting of a hu-

man being, whatever the cause, in a populous city like Salt Lake, is not such a common and ordinary occurrence that the fact that it occurred can long be kept secret; and yet, if appellant's claim is true, the shooting in his case has entirely escaped discovery by any one. The jury were not bound to believe what to all others must appear to be unreasonable and wholly improbable. Again, the jury had the further right to believe that any reasonable human being would be willing to suffer most any humiliation rather than to shield a murderer who could commit a murder as foul as was the murder of the Morrisons. In order, therefore, to advise the officers, as well as the public, that some one else committed the dastardly crime, and to give the officers an opportunity to discover and apprehend the real assassin or assassins, any reasonable person situated as was appellant would at least disclose where and for what reason he was shot, even if he did not pursue the person who shot him, and in that way place the responsibility of the Morrison homicide where it belonged. His refusal to do that by refusing to disclose where and by whom his wound was inflicted, left the jury no choice save to accept the natural and probable inferences to be deduced from all the uncontroverted facts and circumstances, and no doubt, in their judgment, those inferences, without a single exception, pointed to the fact that the appellant was shot in Morrison's store at the time of the homicide, and hence is guilty of the charge preferred against him.

In view, as pointed out by Mr. Chief Justice STRAUP, that no errors of law occurred at the trial, we have no alternative save to permit the verdict of the jury to stand.

McCARTY, J. (concurring). I have with much care examined the record in this case, and am convinced that the evidence is not only consistent with theory that defendant participated in the commission of the crime for which he stands convicted, but that it is inconsistent with any other theory. In my brief discussion of what I regard to be the salient points raised and presented by the defendant, I shall not attempt to set forth or to review the evidence in detail. The statement made by the Chief Justice of the facts and cir-

cumstances in evidence is so full fair and comprehensive, and so clearly reflects the record, that nothing more by way of marshaling the facts need be said.

Counsel for defendant in support of their contention that the evidence is insufficient to justify the verdict claim, among other things, that the defendant was not identified as one of the men who entered the Morrison store on the night in question (January 10, 1914) and committed the crime charged in the information. As I read and consider the evidence. tending to identify the defendant as one of the perpetrators of the crime, it is about as conclusive on that point as though the witnesses had positively identified the defendant as the taller of the two men who were at and in the immediate vicinity of the crime just before and immediately after it was committed. The description that Mrs. Seeley gave of the taller of the two men whom she and her husband met at the intersection of Eight South street and Jefferson avenue tallies with the description of the defendant in practically every particular. She testified that the man she met ''was a sharp-faced man with a real sharp nose, and his nostrils were rather large,'' and that he had a ''defection'' or scar on the side of his face or neck. The defendant was described as having a similar scar on the side of the face or neck, ''a real sharp nose,'' and large nostrils. The witness further testified:

''Q. How does the height of the defendant, Mr. Hillstrom, compare with the height of the man that turned and looked at you there at that time? A. Very much the same. * * * Q. As to build? A. Yes; they were slender built, both of them. * * * Q. How does Mr. Hillstrom, as he sits here, compare in regard to thinness with the man that you saw that day? A. His thinness is just about the same, * * * but his hair is entirely different. Q. In what respect is his hair different? A. His hair has been cut. * * * Q. Did you state whether or not the appearance of the defendant's hair is anything like the hair you saw on this man that night? A. He had light hair; yes; the one I saw. Q. Light hair? A. Yes; medium complexioned, like this man.''

Another witness, Mrs. Vera Hansen, testified:

That she lived on West Temple street directly opposite Mor-

rison's store; that she was at home on the evening of January 10, 1914, between nine and ten o'clock, and "was sitting in the front room, the nearest the street"; that she "heard a loud noise that sounded like pistol shots"; that she immediately "opened the front door and looked out to see what it was"; that she saw a man "just coming out, just stepping out, of the door" of the store, and saw "little Merlin" Morrison "back in the store"; that she then ran out on the sidewalk; that the man she saw came out with his hands "to his chest and in a stooping position," and that she heard him say, "Oh, Bob!" that it sounded like a "voice full of pain; that it was unusually clear for a man's voice, * * * not hoarse at all"; that in less than a week thereafter she visited the county jail and heard the defendant talk, and that his voice "sounded exactly * * * like the voice of the man that came from the store that night calling, 'Oh, Bob!'" that she saw the defendant standing erect in the county jail after he was arrested. "Q. How did his height and how does his height now, Mrs. Hansen, compare with the man that you saw come out of Morrison's store? A. Compares exactly."

Another witness, Nellie Mahan, testified that between nine-thirty and ten o'clock p. m. on the night in question she was at her home across the street south from the Morrison store; that she heard shots, and immediately thereafter looked out of the window and saw a man stooping with his hands on his chest and running from the store diagonally across the street in a southwesterly direction towards the alley mentioned by the Chief Justice in his statement of the facts; that she heard the man say two or three words that she did not understand as he was crossing the street, and then heard him say, "I am shot"; that she saw the defendant at the county jail stand erect, and "all I can say is, that man was very tall and very thin, and so is Mr. Hillstrom."

Counsel for defendant, in their printed brief, refer to and characterize the evidence of Mrs. Seeley as "very shadowy pretense of testimony, * * * thoughtless, loose, flippant talk," and urge that it should have been "stricken from the record." Commenting on Mrs. Hansen's evidence, they say:

"Consider for a moment the utter worthlessness of such

testimony to prove a fact.  *   *   *   The actual experience of
mankind confutes this testimony.''

The *ipse dixit* of counsel are the only expressions (aside
from criticisms, which are without merit, directed to the man-
ner in which the examination of these witnesses was con-
ducted by the district attorney) we have from them respect-
ing this evidence.  No claim is made that these witnesses, or
any of them, were unfriendly to the defendant, or that they
showed any bias or prejudice in the case.  In fact, a perusal
of this evidence, as contained in the bill of exceptions, I think,
will show so far as it is possible for a record to reflect the
demeanor and state of mind of witnesses, that they were not
biased or prejudiced against the defendant, and that neither
of them was ''thoughtless,'' or ''flippant'' in giving testimony.
The weight, however, that should be given the testimony, re-
gardless of whether the witnesses were sedate and serious or
thoughtless and flippant while testifying, was for the jury.

Mr. Wharton, in discussing this character of testimony in
his work on Criminal Evidence (10th Ed.), at section 803
says:

"We have a right to hold, in fact, that it is an absolute law that
each individual should have certain features assigned to him by
which he is distinguishable from all others, and that these features,
while subject to gradual modification by age, should yet retain
their characteristics so as to be distinguishable for months, even
under the most artful disguises.  The whole figure may be changed
by dress; the hair may be cut off or dyed; yet the eyes, *the nose*,
the mouth, *the voice*, remain, each of which possesses traits that
cannot be defaced by any means short of destruction.  *   *   *   But
the face is not the only test.  *Voices are equally distinguishable*, and
their distinguishability has been made the basis of convictions in
criminal courts."   (Italics mine.)

In 3 Wharton & Stille's Med. Jur., section 636, it is said:

"Besides the general appearance, dress, manner and voice of a per-
son, peculiar marks upon the body are very important, perhaps
much the most reliable, means of identification.  Scars, burns, cicat-
rices, fractures, etc., upon some portion of the body of the prisoner,
distinctly remembered by those who have seen them, will generally
be received as evidence of identity.  Very often where the scars
resemble each other they may have been caused by different agen-
cies.  In such cases the evidence of physicians can be brought to

testify as to the cause of the wound. Still such evidence is not always reliable, for a mark of such a nature may exist from exactly the same cause in two different persons. It goes, however, a great way in establishing an identity, and is generally conclusive, unless rebutted by stronger contradictory evidence."

See, also, 3 Chamberlayne, Mod. Ev., section 1367; *Commonwealth* v. *Scott*, 123 Mass. 222, 25 Am. Rep. 81; *People* v. *Botkin*, 9 Cal. App. 244, 98 Pac. 861.

The undisputed evidence shows that the scar on the face and neck of the taller of the two men whom Mrs. Seeley and her husband met across the street a short distance west of the Morrison store just before the homicide was committed corresponded in size and appearance with that on defendant's face and neck. In this case there is, in addition to the scar and other natural features, characteristics and marks more or less peculiar to individuals mentioned by Mr. Wharton, the dangerous gunshot wound inflicted on the taller of the two assassins, which the evidence tends to show corresponded with the gunshot wound received by the defendant the same night. Besides, there are other facts and circumstances in evidence of an incriminating character. The statement made voluntarily by the defendant to Dr. McHugh that he was shot in a quarrel over a woman and wanted the matter "kept private," his refusal to inform the officers of the place and the circumstances under which the alleged "quarrel over a woman" took place, notwithstanding the officer assured him that he would be given his liberty if his statement in that regard should be found to be true (the evidence on this point, as stated by the Chief Justice, was brought out by defendant on his cross-examination of the officer), his throwing away his gun as he was being taken by Dr. Bird to the Eselius home, his request that the doctor turn down the lights of the automobile just before they arrived at the Eselius home, his two "shrill and penetrating" whistles when he and the doctor arrived at and just before they entered the Eselius home, were all so unusual and extraordinary and so at variance with the conduct and movements of men who are peaceably inclined and law-abiding that the jury were justified in finding that the explanation the defendant gave of his wound was false, a mere

subterfuge, and that the Eselius home was at that time a ren-
dezvous for criminals, and recognized as such by the defend-
ant.

There is but little, if any, similarity of facts in this case
and in the case of *State* v. *Hill*, 44 Utah 79, 138 Pac. 1149,
cited by defendant in support of his contention that the evi-
dence is, as matter of law, insufficient to justify the verdict.
In the Hill case the evidence not only failed to identify the
defendant as one of the robbers who committed the crime
there charged, but tended to show affirmatively that he was
not. Whereas in this case the movements and conduct of the
defendant on the night of and soon after the homicide was
committed, coupled with the other facts and circumstances
in evidence to which I have referred, and which are set forth
in detail by the Chief Justice, point with unerring certainty,
as I read the record, to the defendant as one of the perpe-
trators of the crime charged in the information.

I therefore fully concur in the reasoning of and in the con-
clusions reached by my Associate.