## STATE v. RUSSELL.

No. 6630. Decided February 15, 1944. (145 P. 2d 1003.)

118

*Edward M. Morrissey* and *Harold N. Wilkenson,* both of Salt Lake City, for appellant.

*Grover A. Giles,* Atty. Gen., and *Arthur N. Nielsen,* Deputy Atty. Gen., for respondent.

WADE, Justice.

The defendant was charged with murdering his wife in Salt Lake City on January 3, 1943. The jury returned a verdict of murder in the first degree without recommendations. He was arraigned January 30, 1943, at which time he requested a bill of particulars. The Assistant District Attorney offered to furnish this by February 15th, and the court made no order thereon. When the trial commenced on March 15th, the defendant moved to quash the information on the ground that no bill of particulars had been furnished. At the noon recess the court ordered the district attorney to furnish a bill of particulars by 2 p. m. This was done. Whereupon defendant renewed his motion to quash, and objected to the sufficiency of the bill of particulars so furnished. Defendant did not point out any further particular which he desired, nor does he claim that he was adversely affected in the preparation of his case by the failure to furnish the bill of particulars.

The court did not err in refusing to grant this motion. Section 105-21-9, U. C. A. 1943, provides that:

"When an information * * * fails to inform the defendant of the particulars of the offense, sufficient to enable him to prepare his defense, or give him such information as he is entitled to under the constitution * * * the court * * * shall at the request of the defendant, order the prosecuting attorney to furnish a bill of particulars * * *."

Sec. 105-23-3, U. C. A. 1943, provides that:

"A motion to quash the information * * * shall be available only on one or more of the following grounds. * * * (b) That the court has ordered a bill of particulars under the provisions of section 105-21-9 and the prosecuting attorney fails to furnish a sufficient bill."

The bill of particulars as furnished was sufficient. Defendant has not brought himself within the express provisions of the statute nor does he claim that he was adversely affected by the delay. Under these circumstances the court did not err in denying the motion to quash.

About 1:20 o'clock in the morning on January 3, 1943, on the south side of Third South Street, between West Temple and First West Streets, in Salt Lake City, the defendant cut his wife in the neck with his pocket knife thereby causing her death. The cut commenced on the side of her face and extended into her neck severing the blood vessels therein. A policeman in the neighborhood, hearing a woman scream several times, looked and saw two people scuffling about 70 yards away. One of the persons immediately broke away and ran toward the policeman, the other staggered four or five steps and sank to the ground. The person who ran was the defendant, the other was his wife. The defendant ran past the officer, who grabbed him and started to take him back to where his wife was, but after taking a few steps defendant fell to the ground, apparently unconscious. When the officer reached the defendant's wife she was gasping and died shortly thereafter.

The officer went back to the defendant and found him bleeding from cuts in his neck. Upon trying to stop the blood defendant said: "Let it bleed" and tried to claw his hand away from the cut. Defendant was taken to the hospital and later in the day made a statement to the investigating officers. His pocket knife was found near where he collapsed. Its long, pointed blade was open and bloody. In his statement, defendant disclaimed any knowledge of having his knife or that he or his wife used it in the scuffle, but later admitted that he must have cut her and that he had

inflicted the wounds on himself in an attempt at self-destruction.

At the time of the scuffle defendant was on the street barefooted and without hat or coat. His wife was fully dressed. Both had bruises and cuts on the face, neck, head, body and hands. In their home in a nearby court off Third South Street, there was found some blood, the bed was not made up and appeared to have been recently occupied by two persons. There was also found a mopstick broken into three pieces and many splinters scattered in both rooms.

Defendant testified that he and his wife had had continuous trouble for many years; that all during the day, before the killing, she had continuously nagged at him to get a better job; that many times during that day he had left the house during a heated quarrel, went to a beer joint and had a beer or two; that in the evening, after eating their dinner at home together, while he was washing the dishes, she unexpectedly struck him with the poker over the head; that soon thereafter he left the house and went to a beer joint where he remained until it closed; that on his return home his wife was in bed; that he used his pocket knife to core an apple and left it opened on the table and went to bed; that she immediately started quarreling again and when he asked her to keep still and go to sleep she flew into a rage and beat him over the head with her fists; that thereupon they both got out of bed and he put his pants and shirt on and she suddenly hit him over the head four or five times with the mopstick. He took the mopstick away from her and hit her with it a time or two; that while he smoked a cigarette, she dressed, saying she was going to get a policeman, then suddenly she hit him again and he looked up and saw her coming at him with his pocket knife raised in a threatening manner, saying she was going to settle it once and for all; that he threw his hand up and she cut one of his hands; that he retreated into a corner trying to get his shoes on while she continued to attack him with the knife; that he finally ran out of the back door into the street to find an officer; that seeing no officer and it being cold

on his bare feet he started to return to the house when he met his wife. She again attacked him with the knife and in the scuffle which followed he received several cuts before he succeeded in taking the knife from her; that he did not remember cutting her, but did remember her saying her throat was cut; that he then ran away and met the officer and started back when everything went black.

Three women, witnesses for the state, each testified that she had heard the defendant during a heated quarrel threaten to kill his wife if she did not stop doing certain things. The first of these threats was made not more than eight months before the killing, and the last, less than two months prior thereto.

Defendant contends that there was no competent evidence of murder in the first degree. He argues that unless prior to the striking of the fatal blow he had formed a specific design or intention to kill his wife and struck the fatal blow in furtherance of that design he was not guilty of murder in the first degree. He further urges that, except for the testimony of threats made by him on the life of his wife, there was no evidence of any such design, and that such evidence was not admissible to prove such design on account of the remoteness in time between the threats and the killing. Thus, he contends that the court erred in submitting to the jury the question of murder in the first degree, and in giving instructions thereon in the first three paragraphs of Instruction No. 7.

The evidence was sufficient to sustain a verdict of murder in the first degree. It is universally held that the state may introduce evidence of threats made by the defendant against the life of the deceased to show the state of mind of the accused at the time of the homicide, his intention ▆ to kill and malice against the deceased. Remoteness in time is generally held to go only to the weight of the evidence but does not make it inadmissible. Courts have held such evidence admissible where made as long as two years prior to the homicide. *State* v. *Averill,* 85 Vt. 115, 81 A. 461, Ann. Cas. 1914B, 1005; *Sparks* v. *State,* 19 Ariz. 455,

171 P. 1182; *State* v. *Butler,* 96 Or. 219, 186 P. 55; *State* v. *Gates,* 28 Wash. 689, 69 P. 385; 26 Am. Jur. 402; Homicide, Sec. 357. Thus, under the facts and circumstances of this case, this evidence was admissible.

It is not necessary to determine whether this evidence alone is sufficient to show that the defendant, prior to striking the fatal blow, had formed a specific design to kill his wife. The argument that there was no other evidence of such design is based on the testimony of the defendant to the effect that the deceased was the aggressor during the events leading up to the homicide, but the jury was not bound to believe his testimony. He was an interested witness, there was no one else living who knew of those events. Much of his testimony was inherently improbable, and part of it was in conflict with his previous statements. The facts and circumstances which are not in dispute and as shown by testimony other than that of the defendant, taken together with the evidence of his previous threats, were sufficient from which the jury might reasonably be convinced that he had formed a specific design to kill her before he struck the fatal blow.

The giving of the first three paragraphs of Instruction No. 7, however, present two other very serious problems; (1) Was there any evidence to justify the giving of two of the categories of facts which the jury were told constituted murder in the first degree, and (2) Were murder in the first degree and murder in the second degree correctly distinguished? These questions were not argued in the briefs although the giving of that instruction was assigned as error. This being a capital case, it is the duty of this court to consider manifest and prejudicial error even though not assigned nor argued. *State* v. *Stenbeck,* 78Utah 350, 2 P. 2d 1050, 79 A. L. R. 878; *State* v. *Riley,* 41 Utah 225, 126 P. 294.

The first three paragraphs of Instruction No. 7, are as follows:

"You are instructed that under the law of the State of Utah, murder is defined as the *unlawful killing of a human being with malice*

*aforethought.* Murder, under the laws of the State of Utah is divided into two degrees, to wit: First degree murder and second degree murder.

"So far as applicable to this case, every killing of a human being which is *willful, deliberate, malicious, and premeditated,* or which is perpetrated from a *premeditated design unlawfully and maliciously to effect the death of any human being other than the one who is killed* or perpetrated by *any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life,* is murder in the first degree.

"Every killing of a human being perpetrated willfully, unlawfully, feloniously, and with *malice aforethought,* but without *deliberation and premeditation,* is murder in the second degree." (Italics ours.)

Sec. 103-28-1, U. C. A. 1943, defines "murder" as "the unlawful killing of a human being with malice aforethought." This is simply a modification of the common-law definition of murder. The legislature did not thereby attempt to define, in its own language, what constituted murder at common law, but merely adopted the common-law definition of murder, which means that we have also adopted the interpretation placed thereon at common law. It is true that in 4 Blackstone's Commentaries 194, in his definition, quoted from Sir Edward Coke, he uses not only the terms used by our statute but other terms which express our fundamental concept of the necessary elements of crime. He also adds that malice may be express or implied. This is contained in the next Section, 103-28-2, U. C. A. 1943, of our statute. This statutory definition is now the accepted definition or description of murder in practically all of the states. 1 Warren on Homicide, Secs. 63 and 64; 1 Wharton's Criminal Law, 12th Ed., 625, Sec. 419; 2 Brill's Cyclopedia of Criminal Law, 1025, Sec. 614; *State* v. *Lowe,* 93 Mo. 547, 5 S. W. 889; *People* v. *Davis,* 8 Utah 412, 32 P. 670; *People* v. *Halliday,* 5 Utah 467, 17 P. 118. It was obviously the legislative intent to merely adopt the common-law definition of murder together with the construction placed thereon by the courts, as 103-28-3, U. C. A. 1943, divides murder into two degrees and after stating what constitutes murder in the first degree it provides that "any other homicide

committed under such circumstances as would have constituted murder at common law is murder in the second degree."

It is universally recognized, under such statutory provisions and the common law, that a specific intention or design to kill is not necessary in order to commit murder. All that is required is that the killing be unlawful and that it be done with *malice aforethought*. It is the *malice* which is required to have been thought out beforehand, and not the killing. 1 Warren on Homicide, Sec. 65, "Necessity for Intent," Sec. 79; *People* v. *Davis,* supra; *People* v. *Halliday,* supra. Sec. 103-1-3, U. C. A. 1943, says that "malice" imports "a wish to vex, annoy or injure another person, or an intent to do a wrongful act," but a person may have all of that and still not have the *malice* necessary to commit murder. The intentional doing of merely a wrongful act which is not likely to cause great bodily injury with the wish to merely vex, annoy or slightly injure another person, even though it causes death does not constitute murder. 1 Wharton's Criminal Law, 12th Ed., Sections 440, 441, 446, 447 and 450 to 454 and 513. In order to have the necessary *malice* to commit murder (not necessarily murder in the first degree), the killing must be unlawful, it must result from or be caused by an act or omission to act committed with one of the following intentions: (1) An intention or design previously formed to kill or cause great bodily injury; or (2) an intention or design previously formed to do an act or omit to do an act, knowing that the reasonable and natural consequences thereof would be likely to cause death or great bodily injury; or (3) a previously thought out intentional or designed perpetration or attempt to perpetrate one of certain kinds of felonies. This is not limited to arson, rape, burglary and robbery mentioned in Sec. 103-28-3, U. C. A. 1943, but it does not include all felonies. 1 Warren on Homicide, Secs. 62, 71 to 76, 78 and 79; 1 Wharton's Criminal Law, 12th Ed., Sections 420, 421, 447, 504, 507, 509 to 512, and 515

to 518; 2 Brill's Cyc. of Criminal Law, Sections 619 to 636; *People* v. *Davis,* supra; *People* v. *Halliday,* supra.

The statute requires not only that the killing be done with malice but that the malice must have been "aforethought." This simply means the *malice* was thought out beforehand, or previously planned or designed or premeditated. 1 Warren on Homicide, Sec. 79 "Deliberation and Premeditation"; 1 Wharton's Criminal Law, 12th Ed., Sections 421 and 507; 2 Brill's Cyc. of Criminal Law, Sec. 617. It does not necessarily require that the killing be thought out beforehand, or premeditated or designed. Where the *malice* consists of an intention or design to kill, then the term "malice aforethought" requires a previously formed design to kill, but where the malice consists of an intention or design to do great bodily injury, or an intention or design to do an act which is likely to cause death or great bodily injury, or an intentional perpetration of, or attempt to perpetrate the necessary kind of a felony, then the *killing* need not be premeditated, planned, designed, or thought out before hand, all that is necessary is that such acts and intentions which constitute malice be previously planned and designed and thought out before-hand. See authorities cited last above.

Section 103-28-3, U. C. A. 1943, describes what constitutes murder in the first degree and distinguishes it from murder in the second degree. Therein are described four distinct categories of facts which constitute murder in the first degree, and then adds: "Any other homicide committed under such circumstances as would have constituted murder at common law is murder in the second degree." For convenience in discussing this question I have separately stated in the language of the statute and numbered each category or division of facts which constitutes murder in the first degree, as follows:

1. Every murder perpeterated by poison, lying in wait or any other kind of willful, deliberate, malicious and premeditated killing is murder in the first degree.

2. Every murder committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary or robbery is murder in the first degree.

3. Every murder perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than the one who is killed is murder in the first degree.

4. Every murder perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life, is murder in the first degree.

The term "every murder" is used in describing each division of murder in the first degree. Thus, murder in the first degree requires an unlawful killing of a human being with malice aforethought, but not all such killings are murder in the first degree. Only such killing which has the elements required by at least one of these four divisions is murder in the first degree.

Divisions 1 and 3 require a specific intention or design to kill; in division 1, the *killing* must be "willful, deliberate, malicious and premeditated." It is distinguished from the definition of murder, where the *malice* not the *killing* must be aforethought; and it means the same thing as "a premeditated design unlawfully and maliciously to effect the death of any human being" which is the description of murder in the first degree in division 3. Thus the difference between divisions 1 and 3 is that in 1 the design is to kill the person killed, whereas in 3 the design is to kill a person other than the person killed. Divisions 2 and 4 do not require an intention or design to kill. Division 2 requires an intention or design to commit "arson, rape, burglary or robbery," and 4 requires the intention or design to do an "act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life."

The court properly did not submit to the jury the question of murder in the first degree under division 2, but did submit that question to them under the other three divisions.

As previously pointed out there was sufficient evidence to go to the jury under division 1, but there was no evidence from which the jury could find the defendant guilty of murder in the first degree under divisions 3 and 4 and the court erred in submitting them to the jury.

Category 3 requires "a premeditated design unlawfully and maliciously to effect the death of any human being other than the [person] killed." There was absolutely no evidence to justify a finding that the defendant had a design to kill any person other than the person he killed. The evidence is positive and undisputed that he knew that he had been quarreling with his wife all day; that he knew that it was she with whom he was scuffling when he struck the fatal blow and that he knew that he struck her and no one else. Clearly it was error to submit this question to the jury, but it could not mislead the jury or prejudice the defendant.

Division 4 requires the doing of an "act greatly dangerous to the *lives of others* and evidencing a depraved mind, regardless of human life." This requires an act which is, at least potentially, dangerous to other persons and not directed against any one in particular. Such an act is more dastardly than where only one person can be endangered, even though only one is affected thereby. No doubt this was considered in making this murder in the first degree without a specific intention to kill. This division is distinguished from divisions 1 and 3 which require a specific intention to kill a particular person, whereas here, no intention to kill is required, though an intention to kill persons generally may exist, but the act which is greatly dangerous to the lives of others must be directed against people generally and indiscriminately and not against any particular person. In *Darry* v. *People,* 10 N. Y. 120, on page 147, the court in construing a similar provision [see McKinney's Consol. Laws of N. Y. c. 40, Penal Law, Ann. § 1044, sub-div. 2] said:

"* * * this subdivision was designed to provide for that class of cases, and no others, where the acts resulting in death are calculated to put the lives of *many* persons in jeopardy without being aimed at any one in particular."

■

*People* v. *Darragh*, 141 App. Div. 408, 126 N. Y. S. 522; *People* v. *Jernatowski*, 238 N. Y. 188, 144 N. E. 497; *People* v. *Ludkowitz*, 266 N. Y. 233, 194 N. E. 688; *Longinotti* v. *People*, 46 Colo. 173, 102 P. 165; *Mitchell* v. *State*, 60 Ala. 26; *Jewell* v. *Territory*, 4 Okl. 53, 43 P. 1075. Here the evidence is positive and undisputed that the defendant's acts were directed toward and endangered only the life of the deceased and not against people generally and indiscriminately. The court erred in submitting that question to the jury.

Were murder in the first and second degree correctly distinguished? If murder in the first degree was committed in this case it must, as we have shown, come within the facts required by division 1 above. Instruction No. 7 told the jury that every killing "with *malice aforethought,* ▇ but without *deliberation* and *premeditation* is murder in the second degree," and Instruction No. 10 told them that before they could find the defendant guilty of *murder in the second degree,* they must be satisfied beyond a reasonable doubt that "the killing was the result of a specific intention on the part of the defendant to take the life of said Anna Laura Russell." How can an act be done with *"malice aforethought* but without *deliberation and premeditation?"* All three of these italicized terms are usually used interchangeably and with the same meaning. The terms *premeditation* and *afore-thought* both mean to think out, plan or design beforehand. Some courts make a slight distinction between those terms and the term *deliberation,* holding that it requires more calmness of mind and coolness of blood for deliberation than merely to premeditate and think out beforehand, but other courts refuse to make such a distinction. There can be no distinction in the length of time required to think out beforehand, in premeditation and deliberation. Such instruction was certainly confusing. 2 Brill's Cyc. of Criminal Law, Sec. 642; 1 Wharton's Criminal Law, 12th Ed., Sections 506, 507, and 515 to 517; *State* v. *Fairlamb,* 121 Mo. 137, 25 S. W. 895; *State* v. *Lowe,* 93 Mo. 547, 5 S. W. 889; *State* v. *Lewis,* 74 Mo. 222; *State* v. *Thomas,* 157 Kan. 526, 142

P. 2d 692; *State* v. *McGaffin*, 36 Kan. 315, 13 P. 560; 1 Warren on Homicide, Sec. 79.

As pointed out before, it is not necessary in order to commit murder in the second degree, to have a specific intention or design to kill. Under the facts and circumstances in this case all that is necessary in order to constitute murder in the second degree is that the defendant, when he struck the fatal blow, had a specific design or intention, thought out beforehand, to cause great bodily injury to the deceased, or an intention or design thought out beforehand to do an act, knowing the reasonable and natural consequences thereof, would be likely to cause great bodily injury to the deceased. See authorities herein above cited on what constitutes murder. It was not necessary for the defendant to have a specific intention to kill the deceased in order to commit murder in the second degree and the court erred in instructing the jury that it was.

Division 1 above of murder in the first degree requires a "willful, deliberate, malicious and premeditated killing." This simply means that the fatal blow must be struck after deliberately and premeditatedly forming a specific intention or design to kill. Without such intention or design to kill defendant was not guilty of murder in the first degree and such intention or design must have been formed before the fatal blow was struck. If defendant's mind was incapable of deliberately and premeditatedly forming a specific intention or design to kill, he could not commit murder in the first degree under this division, but he still might have the mental capacity to think and form an intention or design to do great bodily injury or to do an act which was likely to cause death or great bodily injury to another, and in case death resulted therefrom he would be guilty of murder in the second degree. *State* v. *Stenbeck*, supra; 1 Wharton's Criminal Law, 12th Ed., Sections 515 to 517. Thus the difference between murder in the first and second degrees as applied to the evidence here is that in murder in the first degree there must be a premeditated and deliberate design or intention to kill before striking

the fatal blow, whereas in murder in the second degree no such intention or design to kill is necessary, but there must be an intention or design thought out beforehand, to cause great bodily injury or to do an act knowing the reasonable and natural consequences thereof would be likely to cause death or great bodily injury to the deceased. *State* v. *Stenbeck,* supra; *People* v. *Davis,* supra; *People* v. *Halliday,* supra; 1 Warren on Homicide, Sections 78 and 79; 1 Wharton's Criminal Law, 12th Ed., Sec. 504; 2 Brill's Cyc. of Criminal Law, Sec. 650. Many states have statutes which make a different distinction on this and other matters; this is true of the State of New York. McKinney's Consol. Laws of New York, Ann. Book 39, Penal Law, §§ 1044, 1046, 1047 and 1050.

This error was prejudicial. Though the evidence was sufficient to justify the jury in finding that the defendant had previously formed a deliberate and premeditated design or intention to kill the deceased much of the evidence tended to show that he had formed no such intention or design. For instance, there was evidence the killing was after a quarrel, which ended in a scuffle in which both parties were cut and bruised, and the cut which caused the death commenced on the side of the face rather than in a vital spot. By instructions 9 and 10 the jury was told that before they could find the defendant guilty of murder in the first or second degree they must find that he had an intention or design to kill the deceased. If the jury followed these instructions and were satisfied that the defendant when he struck the deceased had previously formed an intention to kill her he was not prejudiced because under such circumstances he was guilty of murder in the first degree. On the other hand it might well be that had the court expressly told the jury that murder committed with the intention to kill under the circumstances of this case is murder in the first degree but such murder committed without that intention is only murder in the second degree that the jury might have concluded that the defendant had no such intention and found him only guilty of murder in the second degree, whereas

this distinction not being expressly pointed out, the jury might have, without giving that question particular attention, found him guilty of murder in the first degree. In view of the fact that the evidence tends to show no intention to kill this was prejudicial error. The court also in effect told the jury by Instruction 7 that if the defendant did an act greatly dangerous to the lives of others, evidencing a depraved mind regardless of human life, he was guilty of murder in the first degree. The jury well might have understood therefrom that if the acts of the defendant were greatly dangerous to the life of the deceased, not the "lives of others," and evidenced a depraved mind regardless of human life, that he was guilty of murder in the first degree. This, as pointed out above, is not the law. If the jury understood that to be the law and acted accordingly, defendant was prejudiced thereby.

There is no merit in the other errors assigned. The pictures of the deceased, taken after her death and showing her wounds, were clearly admissible. Even though the defendant did admit the killing, he did not admit the intent to kill and the nature of the wounds may be material on that point. The pictures showed the nature of the wounds more clearly than the testimony of witnesses could. Also the argument of the district attorney, although he drew improper inferences for the evidence of a prior conviction, under the facts here, was not prejudicial.

The case is reversed and remanded for a new trial.

LARSON and MOFFAT, JJ., concur.

McDONOUGH, Justice.

I dissent. While I am in accord with most of what is said in the opinion of Mr. Justice WADE in distinguishing between first and second degree murder, I am unable to agree that the court committed prejudicial error in its instructions to the jury.

I shall first consider the error in instruction No. 10 wherein the court instructed that before the jury could find

defendant guilty of murder in the second degree it must find that defendant had a specific intent to take the life of the deceased. Under the authorities cited this was error. But I am unable to see how it could possibly have prejudiced defendant. The jury was told that unless the specific intent to kill was entertained, a verdict of murder in either degree could not be found. It was further told by such instruction and instruction No. 9, that though the evidence established malice aforethought and a specific intent to kill, nevertheless premeditation and deliberation must also be established before a verdict of murder in the first degree would be justified. The jury by its verdict, if such instructions were followed, found malice aforethought, a specific intent to kill, deliberation and premeditation. Had the intent to kill not been established then, under the instructions, a verdict of manslaughter would be the only guilty verdict permissible. Why an instruction requiring the establishment of a specific intent to kill in order to establish murder in any degree is not favorable to the accused, I am unable to see.

As to the inclusion in the definition of murder in the first degree that portion of the statute which provides that a killing "perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life," where such definition is preceded by the expression, "so far as applicable to this case," it must be conceded that thereby—if the instruction be considered by itself—the jury was invited to consider whether the facts before it were such as to evidence that kind of killing. I agree with the opinion in holding that this was error. However, in the light of the other instructions, I am unable to conclude that there is any likelihood that the jury was misled thereby. In instruction No. 9 the jury was specifically directed that unless it found that the killing by the accused was the result of a specific intent to take the life of the deceased and that it was premeditated and deliberate the accused must be acquitted of the charge of first-degree murder. Nowhere in such or other instructions, except as intimated in the criticized portion of instruction No. 7, was

the jury told that, absent a specific intent to kill, the defendant could be found guilty of first-degree murder. While in a capital case, where a review of the evidence leaves in the mind of the reader a substantial doubt as to the guilt of the defendant of the grade of the offense of which he stands convicted, slight error in instructions may well be thought to have influenced the jury in reaching its conclusion; yet where it is difficult to conceive of a jury disregarding a specific instruction on the very facts before it and basing its deliberations rather on a general definition of the crime charged, though prefaced as was the definition here, a presumption of prejudice should not be indulged.

It must be admitted that a careful reading and consideration of the record leaves in the mind a doubt as to whether the inference of deliberate, premeditated killing is to be drawn. Absent the evidence of previous threats upon the part of the defendant, a killing upon a sudden quarrel or in heat of passion would be the almost inescapable inference. This is so because of the nature of the weapon used, the contusions upon the head of the defendant and deceased and other evidences of a protracted quarrel. But with such threats and their environment in the case, a different picture is presented.

Three women witnesses testified to such threats. Their testimony indicates that there were very frequent quarrels between defendant and his wife. One of such witnesses testified that about two months prior to the homicide while defendant and his wife were living in an apartment house of which the witness was manager, she heard the couple quarreling. Defendant was speaking so rapidly that the witness could not catch all that he said. But she heard deceased exclaim in response to what he said: "You wouldn't want that on your conscience, would you? A blood stain on your conscience, would you?" The witness indicated that the woman spoke in a voice that revealed that she was frightened. Some time afterward the witness in talking to defendant told him that she had heard the way in which he had talked to his wife and warned him that he had

a "very bad temper" and unless he controlled it he might kill somebody. Defendant replied that he didn't think he would do that but that "she sometimes makes me feel that I'd like to kill her."

Some seven or eight months prior to the homicide the Russells were living at an address other than that at which the previously detailed incident occurred. While there, according to two women who lived in the same building, the accused and his wife quarreled very frequently. One of the witnesses testified that during one of these quarrels she heard some one in the Russell apartment being bumped against the wall and heard blows being struck. She concluded that "he was beating her up." On another occasion the same witness heard defendant say to his wife "I will cut your throat, if you don't stop it." On still another occasion, according to this witness, there was a violent quarrel in progress in the Russell apartment during which she heard Mrs. Russell scream and cry out: "Let me up. You're choking me. Call the police." The witness further testified that when she and some other people were admitted to the Russell apartment some minutes later she observed red marks on Mrs. Russell's throat and that the next day the marks had turned black.

The evidence of previous threats, as pointed out in the opinion of the court, were properly received in evidence. It must, however, be conceded that such evidence may have been given undue weight by the jury in reaching a conclusion that a killing was intentional and deliberate. Especially is this true when, as here, the threats were made in the course of quarrels, where such quarrels were frequent and where opportunities to carry out such threats occurred daily without being put into effect. The threats might amount to nothing more than compensation for a bruised ego. See Some Observations on the Law of Evidence—State of Mind to Prove an Act, by Hutchins and Slesinger, 38 Yale Law Jour. 283. Nevertheless, if the inference of an intentional deliberate killing could reasonably have been drawn by the jury from

the evidence including the previous threats, we are not at liberty to draw the contrary inference.

I believe such inference is not an unreasonable one. Certainly from the evidence of previous quarrels involving physical encounters between defendant and deceased, it is clear that defendant was the aggressor—though the provocation for his attacks is not very definitely revealed. In the light of such fact, disregarding defendant's story of the quarrel which preceded the homicide, as the jury well might do, it is reasonable to conclude that defendant on the night of the homicide was the attacker and not the one attacked. The fact that the two had evidently occupied the bed in their apartment on the night in question; that at the time of the killing the victim was fully clothed and the defendant partly disrobed and in his bare feet, clearly indicate that deceased had dressed to leave the apartment and had done so, and the inference that defendant hastily followed her without waiting to dress is clearly a permissible one. If this be true, then to conclude that the wielder of the knife, rather than the victim of the attack, carried the knife from the apartment, either to prevent her departure or to do her bodily harm is wholly reasonable. Adding to such facts, the previous threats and the circumstances surrounding them. I think it cannot be said as a matter of law that the verdict is unsupported by the evidence. Since I disagree with the majority on the question of the prejudicial effect of the court's instructions, I have detailed the nature of the previous threats and have discussed their bearing on the question of the justification of the verdict rendered.

WOLFE, Chief Justice (concurring with Mr. Justice McDONOUGH).

I, too, am in accord with most of what is said in the opinion of Mr. Justice WADE in distinguishing between first and second-degree murder. Had I been on the jury I might have had grave doubt as to whether the verdict should be for first-degree murder but under the evidence as detailed by Mr. Justice McDONOUGH I think it was a question for the

jury. It is our duty always to keep within our province as well as to keep the jury within its province.

I do not thing that the trial court in giving instruction No. 7 meant that *malice* as required in murder cases must not have arisen before the killing to make it malice aforethought but that the matter of killing in order to come within the first division of first-degree murder must have been designed or deliberate and premeditated beforehand.

If there was no killing planned or deliberated and no malice in the mind of the defendant aforehand, the killing unless justifiable would be in the heat of passion and come under the voluntary manslaughter section. I think the fair intendment of instruction No. 7 when read in the light of other instructions was to tell the jury not that malice need not be aforethought but that the intention to kill when such constituted the malice had to be deliberate and premeditated to make it first-degree murder under the first category defined. I rather think that the words "every murder perpetrated by poison, lying in wait or other kind of deliberate, malicious and premeditated killing" show that there must be time enough to deliberate and include such killings similar to the class of lying in wait, or by poison and exclude those where the intention to kill is so sudden as to preclude time to deliberate *and* premeditate. But where to draw the limits of the zone which separates killings done in the heat of passion, although with intention, and those done with deliberation and premeditation is quite difficult. Certainly it takes some time to premeditate and deliberate. But there may be killings where the central idea was not to kill but only to do harm when the malice was first generated, yet on the instant of killing or the instant before killing such malice ripened into an intention to kill but without time enough to say that the killing was deliberate and premeditated. It would seem that such might fall in the category of second-degree murder.

While I agree generally with what is said by Mr. Justice WADE in regard to the fourth division making murder one of first degree when the killing is caused by the perpetration

of an act greatly dangerous to the lives of others, I want
to add emphasis to the fact that a very necessary element
of such killing is that the one perpetrating the act must
have done it under such cimcumstances as to evidence a
depraved mind and have done it with at least such great
indifference to human life as to make the state of mind one
equivalent to that which entertains an intent to kill. That
is the constructive intent. But there must be the affirmative
attitude of mind of not caring. Where one does something
greatly dangerous to others with gross or criminal negli-
gence he may be guilty of involuntary manslaughter only.
To lift the killing to the level of first-degree murder the
person must not have been grossly thoughtless or grossly
negligent merely but have affirmatively had at least the
attitude "I do not care whether I kill or not." This is the
depraved mind which must accompany the loosening of force
which does the killing.

I agree that this type of first-degree murder fits the case
where the force is loosed without intention to direct it
against a particular person. It fits the case where the force
is generally loosed regardless of what or whom it may affect
with a definite vicious or devil-may-care attitude. It is not
necessary that the perpetrator be aware of the fact that the
situation is such that it may kill or operate on more than
one. He may not know whether one or several or many are
in position to receive the consequences of his perfidy. It is
sufficient if with utter and conscious indifference to human
life he deliberately lets loose a deadly force in such a way
and in such place where it is reasonably likely to injure or
kill one or more persons, no particular one of which he neces-
sarily chooses for slaughter. Certainly the person who
planted the time bomb along the line of the San Francisco
Preparedness Day Parade may not have specifically in-
tended to kill any one. He may even have hoped that it would
not kill any one but would make that sort of agitation to
popularize preparedness very unpopular. And when he
planted it he may not have known whether it would go off
where many or where no people were standing. But he did

intend the act of loosing a force highly dangerous to human life, and with utter disregard for that life. He thus perpetrated an act which was greatly dangerous to and regardless of human life but in such manner to exhibit a depraved mind regardless of whether he entertained a faint hope that no one might be hurt. That state of mind was beyond gross carelessness. It contemplated harm and direful consequences. It would have been the same if it did not so contemplate harm but intentionally did the act knowing it to be highly dangerous yet with utter indifference as to whether it would or would not take life. Both states constitute the guilty mind.

With these comments on the opinion of Mr. Justice WADE, I concur in the opinion of Mr. Justice McDONOUGH that the instructions given were not prejudicial.