# STATE v. MATTERI

No. 7413.   Decided December 13, 1950 (225 P. 2d 325.)

Rehearing denied March 20, 1951.

*Joseph C. Fratto, Gordon B. Christenson, William D. Callister,* Salt Lake City, for appellant.

*Clinton D. Vernon,* Atty. Gen., *Bryce E. Roe,* Asst. Atty. Gen., for respondent.

PRATT, Chief Justice.

The appellant, Fred Matteri, was convicted of the first degree murder of one Levi P. Delk, and he appeals. His conviction was upon circumstantial evidence. The jury recommended leniency. The trial judge imposed the death penalty.

The body of the deceased was discovered in a stream near one of the canyons south and east of Salt Lake City, and in Salt Lake County, on Friday, May 6, 1949. The examination of the body revealed several injuries on the body. The most severe was an irregular laceration of the scalp extending from the top of the head down below the left ear on the rear part of the head, measuring about six by nine inches. At the site of this laceration the skull was broken into several pieces. There was a laceration on the front of the head extending to the bone. The throat had been punctured with a sharp instrument, however. This occurred after the death of the deceased. On the right side of the forehead there was a bruise two inches in diameter. There were other abrasions on the forehead, nose, right knee and left leg. The cause of death was determined to

have been from the head wound, inflicted by a blunt object, possibly with a sharp or jagged edge, which weapon was never found. The body was partially clad, and from papers found on the body, the identification was made. The last time Delk was seen alive by the operators of the tourist court and trailer camp where he lived, was Friday, April 29, 1949, in the evening. The doctor who performed the autopsy gave it as his opinion that the body had been immersed in water for a prolonged time, but he didn't venture an estimate as to how long a time Delk had been dead. He did estimate that at the time he performed the autopsy, Delk had been dead a minimum of from 24 to 48 hours. He said that from the state of shock evidenced by Delk's organs he would say that Delk lived for a few hours, possibly two or three, after the wound was inflicted.

The circumstances surrounding defendant's apprehension and the charge of murder being filed against him came about as follows:

Matteri, together with his wife and family, lived in a tourist court trailer camp on South State Street, having moved in on March 7, 1949. They resided in one of three connected rental units there, the only one of which was completed. After about April 20, 1949, Matteri resided there alone. Delk likewise resided there, renting an electrical outlet and space for his Willys panel truck in which he lived. He began living there April 13, 1949.

On April 30, 1949, Matteri appeared before a notary and represented that he was Levi P. Delk, and signed the certificate of title to a Willys panel truck, which vehicle was identified at the trial as having belonged to Delk. During the morning of the same day, Matteri again representing himself as Delk, sold the Willys truck to Arch Browning, Inc., a car dealer, for $650 cash, mostly in twenty dollar bills. A cash transaction was insisted on by the appellant. No ignition key was turned over to the car

dealer, and in fact, the ignition wires had been crossed as to dispense with the need of a key. On the same day, April 30, Matteri purchased a 1936 Ford, in his own name, from another used car dealer, paying for the same with twenty dollar bills.

On May 2nd and 3rd, Matteri sought to sell a gold watch to two of his fellow workmen, but upon failing to do so, pawned the watch at a local loan office, late in the afternoon of May 3rd, and in his own name. The watch was definitely identified as having been owned by Levi P. Delk during his lifetime.

Eye glasses positively identified as having belonged to Delk were found by Mrs. Christiansen, co-proprietor of the tourist court. These glasses were found in the gravel outside the center unit of the connected units, by Mrs. Christiansen, on the morning of May 1, 1950. At that time she asked Matteri if they were his, to which he replied in the negative. Mrs. Christiansen testified that Matteri appeared upset when she saw him that morning, but she attributed this at the time to the fact that Matteri's wife had recently left him. A small gold-plated watch-fob knife, identified as a corn cutter belonging to Delk, was found in an open field south of this same building.

Matteri continued to live at the tourist court until May 4th or 5th, when he left. His rent was paid to May 7th.

After the body was discovered and identified, a search was made of the tourist court, and the middle unit of the tourist units, which was at this time unfinished and unoccupied yielded certain clues and information. On the floor of this unit, two rather large spots or stains were found. They were reddish brown in color, having the appearance of blood. One spot was dried, the other was still moist and appeared to be mixed with vomit, as determined by the smell. The appearance of the room gave some indi-

cation that a struggle had ensued there. A paint stick found on the floor and some paper found there, had blood stains on them in sufficient quantities to be identified as such, and classified as type "A" under the International Blood Grouping system. The victim was shown to have had type "A" blood.

Samples from the rubber matting of the Willys truck contained stains which tested positive for possible presence of blood, as did also the panel on the left door of the truck when tested by the F. B. I. in their laboratory .

The key to the unit occupied by Matteri also fitted the door of the unfinished units.

A button found in the vacant center unit matched identically with the buttons on the shirt found on the decedent as to material, shape, design and shading, but was slightly smaller and slightly thicker, and the threads attached to the button appeared identical with that used to attach the buttons to deceased's shirt.

Though the evidence is circumstantial, it points rather conclusively to the accused as the killer. Mr. Delk was last seen between 5 and 6 o'clock p. m., of April 29th, as he returned to the tourist court. The following morning Matteri purporting to be Delk sold Delk's car, and within a few days pawned Delk's watch. When these factors are placed alongside the fact that Delk was brutally beaten and killed, and the fact that the unfinished apartment adjoining Matteri's bore evidence that this was the place where such beating took place, and the discovery of the body partially submerged in a stream, to which it apparently was hauled in the truck, and into which it appears to have been thrown for disposal, little more need be said to induce a belief that accused was the killer.

On this appeal, it is urged that there is no evidence of first degree murder against the defendant.

The bill of particulars furnished the defendant, charged defendant with having killed Delk with deliberation, premeditation and malice aforethought and with having killed Delk in the course of committing a robbery. The court limited the instructions to the first above, that of a deliberate premeditated killing with malice aforethought.

Defendant predicates his contention that first degree murder has not been made out on the theory that there was no evidence of premeditation, deliberation, nor of malice aforethought, nor of a specific intent on the part of the defendant to kill Delk. Says appellant:

"When we speak of 'deliberation,' 'premeditation,' and 'malice aforethought,' and 'specific intent,' we are speaking of the state of mind, the mental attitude or intent of the accused formed prior to the commission of a homicide. Not being able to probe the mind itself, such state of mind must of necessity be determined by the actions of the accused."

With this we would agree. But, says appellant, "the state of mind is determined by the actions of the accused prior to, and at the time of the commission of the act with which it is connected." Appellant then concludes that there were no acts of Matteri's prior to the homicide which show any state of mind in relation to Delk. That "there were no acts of preparation, no securing or selecting of weapons, no lying in wait; there were no boasts, no threats, no arguments, nor other difficulties between the accused and Delk." True, had any of the enumerated items been present, the case against the defendant would have been made considerably stronger, and a conviction more readily anticipated. However, the absence of such facts does not mean that the jury cannot find the requisite state of mind on the part of the defendant, in order to make out first degree murder. Nor does it mean the jury is powerless to return a first degree murder verdict simply because an accused has by stealth successfully covered up any indication prior to the killing, as to what he was planning. To follow appellant's reasoning would be

to say in effect that if the killer is sufficiently careful to see that nothing he does in advance of the killing meets the public eye, then he has avoided any chance of being convicted of first degree murder. The killing of a human being by another is frequently attended by circumstances of secrecy, both as to the deed, and as to the doer. Such killings should not escape classification as first degree murder simply because no evidence is available to prove the lying in wait or any other of those specific factual situations stated by the appellant as not being present in this case. As a matter of fact, the fact that no more was found to connect Matteri to Delk, is some indication of careful preparation.

Let us look then to the facts which we do have before us. The nature and extent of the injuries have previously been considered. They evidence a brutal beating. An expert indicated that the force of the blow which killed Delk was sufficiently great that it probably would not have resulted from a fall to the ground after a blow to the chin, and that to cause such an injury by a fall, the fall would have had to be from a great height. A medical expert was certain that death had not been instantaneous, but that Delk probably lived for two or three hours after the blow on the head, but would be unconscious, and that such an injury would be fatal. The physical evidence indicates that Delk was removed from the place where the blow was struck, and placed in the creek, or so the jury could find. We have already reviewed the circumstances surrounding the sale of Delk's automobile on the morning following his last appearance at the auto court, and the attempted sale, and pawning of the watch. While the jury might not have been justified in concluding that the killing was done in the perpetration of a robbery, the jury could well have found that the motive for the killing was the wrongful taking of deceased's property, and that the appellant selected Delk as his victim deliberately and premeditatedly, knowing as he

did, that here was a man living alone, under semi-transient conditions, anl who likely wouldn't be missed nor sought particularly, nor identified in the event his body was found.

The manner of disposition of the body and of the truck and the watch give every evidence of a preconceived plan to kill this particular person, dispose of his body to avoid discovery of the crime, and possess and sell his property, as a motive for so doing. The entire picture may be summarized as a brutal beating and killing at one spot, a disposal of the body at another, a false personation of deceased for the purpose of selling his property, and disposal of some of that property as the accused's; and all without any evidence of an explanatory character. Certainly such a picture not only identifies the accused with the offense, but supports implications of malice, and of a planned course of conduct that justifies an inference of deliberation and premeditation. As stated in Warren on Homicide, Vol. 1, p. 372, sec. 78:

> "Where a person takes the life of another by an act naturally calculated to produce that result, in the absence of explanatory circumstances rendering the homicide excusable, or criminal in some degree less than the highest, or creating a reasonable doubt, the law presumes that he intended the result effected, and he is guilty of murder in the first degree."

We are convinced that there is evidence from which the jury could properly and justifiably find first degree murder, and the court did not err in so instructing the jury. Nor, was it improper for the court to instruct on second degree murder. It was for the jury to determine the degree of homicide.

Now to the argument that the court misdirected the jury in giving instruction no. 7 as to the degree of the offense: The part objected to is the following:

> "You are further instructed that if you believe from all of the evidence beyond a reasonable doubt that the defendant committed either the offense specifically charged in the Information or one of the included offenses, but

if you have a reasonable doubt as to which of two or more offenses he did commit, then you can convict him only of the lowest degree as to those between or among which lies your doubt."

It is contended that the court should have used "must" instead of "can" in the instruction, because the statute provides under such circumstances the jury must find him guilty of the lowest degree. The objection is that "can" carries the meaning "to have ability, skill, knowledge, capacity or means," while "must" is mandatory and compelling. The phrase used however, is *"can"* convict him *only* of the lowest degree," and this as truly describes what the jury is allowed to do, as would the use of the mandatory language found in the statute. That is, "can * * * only" indicates the limitation under which the jury is bound to act, and yet is more favorable to the defendant than the language in the statute in that it does not compel the jury to find even the lesser degree. This is perhaps well illustrated by the following quotation from the case of *State* v. *Cerar,* 60 Utah 208, 207 P. 597, 601, where this court said:

"It is somewhat vigorously contended that the court erred in using the word 'can' instead of the term 'must,' which latter term is used in the statute. A mere cursory reading of the instruction excepted to will disclose that, if the district court had used the term 'must,' counsel in all probability would be here complaining that the court had in effect directed the jury to find the appellant guilty of some degree, and in such event there would at least be some reason for the contention. By using the term 'must' in the instruction referred to, a very awkward expression would have resulted which might have been construed to mean that the jury was required to find the appellant guilty of some lower degree. The instruction as it stands, in our judgment, clearly reflects the true intent and purpose of the statute, and any juror with sufficient intelligence to sit in any case could not have been misled by what the court said."

There was no error committed in the giving of instruction no. 7, as complained.

After the jury had been deliberating for some time the court called the jury in to make inquiry concerning their progress. At that time the foreman indicated that the jury was troubled by one of the instructions,

no. 15, which dealt with the recommendation of life imprisonment, and asked the question:

"We ask the recommendation, just what is it—what we would like to know is how you look at it."

The court in answer to this inquiry said:

"Oh, well, what that means—now, I tell the jury now that I will make investigations before I act one way or the other. If you make recommendations, all you do is to untie my hands so that I may not order the defendant executed. If you do not sign that, then you do not permit me to make any investigation or to determine. I can't tell you now what I am going to do because I don't know. I would need more information than I now have before I would act in a matter of this weighty importance. I have ways and means of securing information that this jury would not have, but you do not tie my hands nor compel me to follow your recommendations. You merely give me the right to do it after making an investigation I feel that it should be done, then I can, but I am not obligated to."

The court could not, of course, disclose to the jury whether he would or would not follow a recommendation of life imprisonment. Had he done so, likely it would have constituted prejudicial error. Furthermore, he should not make any statements to the jury that tend to induce the jury to act one way or other. The matter lies entirely within the discretion of the jury. *State* v. *Romeo*, 42 Utah 46, 128 P. 530; *State* v. *Markham*, 100 Utah 226, 228, 112 P. 2d 496. They should receive no direction from the court upon the matter. The court in the present case sought to explain to the jury what the effect of a recommendation under that instruction amounted to, and what the effect of it was. He gave them no indication that he would follow or not follow it, but explained to them what he could do under such recommendation. The reference to tying his hands has, inadvertently, certain ear marks of inducement, but we do not believe it prejudicial as it resulted favorably to the accused, so far as the jury verdict was concerned. Nor do we believe there is anything in the record to indicate that the court abused his discretion in refusing to follow the recommendation of the jury. We

are not in the position to assume the recommendation was made because of a weak case on the part of the state, as appellant would have us do; any more than we could assume that the jury could not make up their minds whether the defendant should die for his crime, and so left the question to the judge to decide. Their reason for so recommending does not appear, and does not have to appear, in the record.

Ordinarily this court will not, of its own motion raise questions of error for consideration. However, in capital cases it is our duty to do so, where such errors exist. *State* v. *Russell,* 106 Utah 116, 145 P. 2d 1003; *State* v. *Stenback,* 78 Utah 350, 2 P. 2d 1050, 79 A. L. R. 878; *State* v. *Riley,* 41 Utah 225, 126 P. 294. Accordingly, we consider one further matter raised by virtue of the instructions given in the case.

This case is beset by the same problem which was present in the case of *State* v. *Trujillo,* Utah 1950, 214 P. 2d 626. This is illustrated as follows:

The trial court instructed the jury that Second Degree murder, so far as the law applicable to this case is concerned, is

"the killing of another after having formed a specific design or intention, thought out beforehand, to cause great bodily injury to the deceased, or after an intention or design, thought out beforehand, to do an act, knowing the reasonable and natural consequences thereof would be likely to cause great bodily injury or death to the deceased."

Eliminated from the case entirely, so far as second degree murder is concerned, is the possibility of second degree murder when there exists an intent to kill. While intent to kill is not a necessary requisite to second degree murder, it may be an important element if there is absent other elements to raise the killing to first degree murder. Could the jury in the present case reasonably determine from the facts, that there existed an intent to kill and malice aforethought and yet be not convinced beyond a reasonable

doubt that the state had made out deliberation and pre-meditation? If they could so reasonably decide upon the circumstantial evidence presented to them in this case, then there was prejudicial error in this case as in the Trujillo case, in failing to include intent to kill as an element of second degree murder.

First let us point out that the omission from Instruction no. 11 of the element of intent to kill, was one invited by defendant's counsel, since they requested that instruction in substance in their request no. 10. Despite this fact however, this being a capital case, we should take cognizance of any palpable error in the record which might have prejudiced the defendant though not assigned, or even if invited by the defendant himself. It must be remembered that the instructions of the trial court should be addressed to the case before it; and the adequacy of instructions should be judged in the light of the facts. Let us again consider what we said above about the facts of this case:

The manner of disposition of the body and of the truck and the watch give every evidence of a preconceived plan to kill this particular person, dispose of his body to avoid discovery of the crime, and possess and sell his property, as a motive for so doing. The entire picture may be summarized as a brutal beating and killing at one spot, a disposal of the body at another, a false personation of deceased for the purpose of selling his property, and disposal of some of that as the accused's; and all without any evidence of an explanatory character. Certainly such a picture not only identifies the accused with the offense, but supports implications of malice, and of a planned course of conduct that justifies an inference of deliberation and premeditation.

It would seem that any other conclusion would be wholly unreasonable. If the jury had any doubt as to an intent

to kill, and consequently chose to draw the inference that Delk was killed in a fight or that he was killed when the defendant had merely the intent to do him great bodily harm, that situation was adequately covered by Instruction no. 11. We have some doubt that the facts and circumstances given in evidence required any instruction on second degree murder. It is hard to believe that a jury of reasonable men could find an intent to kill with the wrongful taking of deceased's property as the motive—and that was the only motive inferable from the evidence—and at the same time entertain the slightest doubt about the presence of deliberation and premeditation. If there was no intent to kill, then the instruction given adequately covered the case.

That it is not error for a court to refuse to instruct on second degree murder, where the charge is murder in the first degree, in cases where the evidence would support only a finding of first degree murder or acquittal, is the settled rule in this jurisdiction. See *State* v. *Condit,* 101 Utah 558, 125 P. 2d 801; *State* v. *Mewhinney,* 43 Utah 135, 134 P. 632, L. R. A. 1916D, 590; and *State* v. *Thorne,* 41 Utah 414, 126 P. 286. The foregoing are cases involving killings in the perpetration of a robbery. As to included offenses generally, see *State* v. *Angle,* 61 Utah 432, 215 P. 531.

The only evidence bearing upon the killing of the deceased was that adduced by the State. There was no evidence direct or indirect of any mitigating circumstances. As stated by this court in *State* v. *Hillstrom,* 46 Utah 341, 150 P. 935, 942:

"The state, as in all other criminal cases, was required to prove the defendant's guilt beyond a reasonable doubt. But the defendant, without some proof tending to rebut them, may not avoid the natural and reasonable inferences deducible from proven facts by merely declining to stay off the stand or remaining silent. If in case of larceny the theft and the unexplained or unsatisfactorily explained recent possession of the stolen property in the accused are shown, he may not avoid the natural inference deducible from such facts that he is the thief by remaining silent

or staying off the stand, and offering no proof to rebut such inference. Here the commission of the offense is proved beyond all doubt. That is conceded. Other facts also are shown from which natural and reasonable inferences arise that the defendant was one of, and the active, perpetrator of the offense. The probative effect of them and the natural and reasonable inferences deducible from them cannot be avoided by the defendant remaining silent or refusing to take the stand and offering no proof to rebut them. While the proven facts and inferences against him are neither strengthened nor weakened by his mere silence or failure to take the stand, yet when he, with peculiar knowledge of facts remains silent, or has evidence in his power by which he may repel or rebut such proven facts and inferences, and chooses not to avail himself of it, he must suffer the consequences of whatever the facts and inferences adduced against him tend fairly and reasonably to prove."

The California case of *People* v. *Watts*, 198 Cal. 776, 247 P. 884, 891, is a case so strikingly like the instant case that the observations made by the Supreme Court of that state are peculiarly apt. There, as in the instant case, there was no eye-witness to the tragedy, the evidence being entirely circumstantial. The body of the deceased, one Wilfred Hey, was found in a lonely spot on the desert of San Bernardino County. Hey, a young Englishman, had lived in the same apartment with the defendant in Detroit, Michigan, for two or three weeks prior to the time both left in defendant's car for California. Hey had some bonds in an English bank worth about $1500 and he had a $100 deposit in a Detroit bank. Before leaving Detroit, he arranged with the bank in that city to dispose of his bonds in England. While on the way to California, he wired the bank for certain sums of money out of his account. Hey and the defendant were seen together at several places between Detroit and Silver Lake, California. That was the last place they were seen together and it was in that neighborhood that the body was found. Several days after the two men were seen at Silver Lake, the defendant went to the Bank of Italy in Los Angeles and representing himself to be Hey inquired about a telegraphic transfer to that institution of money from a Detroit bank. It appears that sometime prior to the defendant's visit to the Bank of Italy

the bank had received telegraphic instructions from the Detroit bank to pay to Hey a certain sum of money, the proceeds from the sale of his bonds. In response to the defendant's request, the bank issued to the defendant, in the name of Hey, a teller's exchange for the amount it had been authorized to pay to Hey. Defendant then, under the name of Hey, opened a bank account at the Bank of Italy. Later, he drew this money and departed to San Francisco. The court held the evidence sufficient to sustain a verdict of murder in the first degree. Error was predicated upon the refusal of the trial court to instruct as to second degree murder. In addressing itself to that contention, the court said:

"The instruction which was given in this case, limiting the jury to a verdict finding the accused guilty of the highest offense or not guilty of any crime whatever, was fully warranted by the facts disclosed by the evidence. The blows which caused the death were inflicted with a heavy, blunt instrument which, under the circumstances of its use, may well have been found to be a deadly weapon. There was, as we have said, nothing to show a struggle or a combat. On the contrary, the evidence shows that if the killing was done by defendant the deceased was put to death in furtherance of a base, mercenary motive. Under these circumstances we have no hesitancy in saying that if defendant was guilty of anything he was guilty of brutal and ruthless murder, done willfully, deliberately, and with premeditation. If there was a failure of proof as to any element necessary to the establishment of murder in the first degree, there was a like failure of proof as to any lesser grade of homicide. Either appellant is guilty of murder in the first degree or he is entirely innocent.

"Moreover, even if the giving of the instruction were error, it could not have harmed appellant. As we have stated, the jurors, who were fully instructed as to the ingredients of the crime of murder in the first degree, were told in effect that if they were not satisfied that defendant was guilty of that offense they must acquit him altogether. It will be presumed that they heeded this instruction and performed their whole duty in accordance with it. If they were not satisfied beyond a reasonable doubt that appellant was guilty of first-degree murder, under the instructions they would have acquitted him. The instruction therefore would not have justified a reversal even if it had been error to give it. *People* v. *Lopez*, 135 Cal. [23], 25, 66 P. 965."

In the present case the jury was given an opportunity of finding a lesser degree of homicide. They were not forced

to an alternative of "all or nothing." This was favorable to the accused. We do not believe there was prejudicial error committed. The facts in this case are, of course, distinguishable from those in the Trujillo case. There the inferences to be drawn were not so limited in scope as here.

Judgment affirmed.

McDONOUGH, J., concurs.

WOLFE, Justice.

I concur. I do not think it would have been error under the facts of this case for the court to have refused to give an instruction on murder in the second degree. The evidence from which the jury could and did infer a killing of Delk by the defendant was such as to preclude any other reasonable inference than that if Matteri was guilty of the killing, he did it deliberately and with premeditation and with robbery as the motive. The only other alternatives were either that Matteri did not kill Delk, in which case he would not have been guilty of murder in any degree, or that he got in a fight with Delk and killed him upon a sudden quarrel or in the heat of passion. Unlike the Trujillo case, there is no basis in the evidence for the latter alternative, and unlike the Trujillo case there is no evidentiary basis for an instruction on murder in the second degree. Matteri himself was the only one who could furnish such basis of evidence and he remained mute. To put to the jury an issue with no basis of evidence to support it leaves them to unadulterated guessing and speculation. In the Trujillo case, the background furnished a sufficient basis of evidence to permit a choice of determining whether there was a deliberate and premeditated intention to kill—murder in the first degree—or whether the killing was upon a sudden quarrel—voluntary manslaughter—or an intent to do only great bodily harm, or a sudden and unpremeditated or unthought-out intent to kill—any of which would have justi-

fied the jury in finding murder in the second degree which degree I, in the Trujillo case, termed a residual category of murder.

In this case, the same evidence from which the jury could infer that Matteri killed Delk necessarily raised the inference that he killed him for gain and that, therefore, the killing was planned and deliberate. The evidence all came in one closely-knit package. The choice was one only between deliberate and premeditated intention to kill—murder in the first degree—or that he did not kill Delk. To permit the jury to speculate in the dark with no evidentiary basis as to whether the killing was unintentional or with sudden and unpremeditated intention or in a sudden quarrel or in the heat of passion would have been error. That the trial court did instruct on second degree murder was unnecessary, but the error was in favor of the defendant and he can not complain. This was a case under the facts of "all or nothing." So far as murder is concerned, it was done with premeditated intent or was not murder at all. But I have no complaint with the statement of Mr. Chief Justice PRATT that the jury must have determined that Matteri committed murder in the first degree in the light of a choice given by the court between first and second degree murder. I would only differ in this, that the court should have given the jury a choice only between not guilty and guilty of murder in the first degree, and that even after it withdrew from the jury the issue of whether Matteri had killed Delk in the course of committing a robbery. True, the cases may be rare in which when all the evidence adduced is circumstantial, the court could be safe in omitting an instruction on second-degree murder. But it must be kept in mind that in cases of solely circumstantial evidence, the circumstances may fit together in perfect jigsaw fashion and so fitting together make a stronger case than many cases where the testimony is furnished by witnesses who testify as to facts derived through their senses. This

is one of those cases. As says the main opinion, the California court had no difficulty with a strikingly parallel and similar case. See *People* v. *Watts*, 198 Cal. 776, 247 P. 884, discussed in the main opinion.

In a very recent California case, *People v. Lloyd*, Cal. App. 220 P. 2d 10, 14, in which there was only circumstantial evidence but meshing in a peculiarly convincing fashion, the court said:

"Appellant intended to say that the court prejudiced the prisoner by not charging on second-degree murder and in not preparing a blank verdict accordingly. The facts established by the prosecution witnesses prove nothing short of murder in the first degree. Since appellant denied *in toto* such testimony, denied his presence on the premises of the deceased on the night of the murder, why should the court have confused the sole issue of murder in the first degree with instructions concerning, and definitions of, crimes included in the crime charged? In charging a jury, the court should be guided by the facts proved. When a person is accused of murder in the first degree, if the evidence is of such nature as to warrant a verdict for no lesser crime, if the defendant is guilty at all, the court should refuse to instruct as to crimes included within first-degree murder. By so doing the court does no violence to the constitutional inhibition against instructing with respect to matters of fact. *People* v. *Watts*, 198 Cal. 776, 793-794, 247 P. 887. Thus, the court below was wholly justified in not charging with respect to second-degree murder or any less savage offense since there was no evidence tending to show such milder crimes. 198 Cal. at page 794, 247 P. at page 887. The same question was raised in *People* v. *Sameniego*, 118 Cal. App. 165, 171, 4 P. 2d 809, 5 P. 2d 653, wherein the appellant accused of first-degree murder contended that the court erred in not instructing the jury as to the law of murder in the second degree in order that the jury might return a verdict for the lesser offense. The contention was rejected for the reason that all the evidence proved that the homicide was a murder of the first degree. Just as in the Watts case, supra, there was no evidence in mitigation, justification or excuse; and as in the case at bar the totality of their efforts was devoted to establishing an alibi."[1]

In our jurisdiction, as in others, the failure of the defendant to go on the stand is not to be held against him and the law expressly provides that his failure to be a witness

---

"[1]. See 8 Cal. Jur. p. 378 where the editor sets forth an extensive array of authorities and includes an intelligent section (410) in support of the doctrine."

on his own behalf shall not in any manner prejudice him or be used against him in the trial or proceeding. Instruction no. 5 told the jury that "the failure of the defendant to testify is not even a circumstance against him and no presumption of guilt can be indulged in by the jury on account of such failure on his part." Be that as it may, no power in heaven or on earth can prevent the minds of the jury from being adversely influenced against the accused by reason of his failure to testify when the evidence is to the effect that he disposed by fraud and forgery of the personal property and effects of a person, the condition of whose body when found furnishes plain, unmistakable evidence of foul play. In Judge *Rudolph's* dissenting opinion in *State* v. *Wolfe,* 64 S. D. 178, 266 N. W. 116, 122, 104 A. L. R. 464, the following statement attributed to Mr. Chief Justice HUGHES (while Secretary of State in 1924) is quoted:

"* * * It is clear that reversals because a prosecuting attorney has directed the attention of the jury to a circumstance which no intelligent person can help taking into consideration of his own accord, should have no place in any well-ordered system of criminal procedure."

I incline to the view that the constitutional protection of the accused being required to testify against himself was aimed only at direct compulsion and not at protecting him against inferences which might be drawn from his failure to testify when the circumstantial evidence is such as to point glaringly at him as the killer and he is the one person who could explain or rebut the potent references from the circumstances. But I accept at this time the rule that requires that nothing be made by the State of the failure of the accused to testify. Yet as was said in *State* v. *Hillstrom,* 46 Utah 341, 150 P. 935, 942:

"* * * While the proven facts and inferences against him are neither strengthened nor weakened by his mere silence or failure to take the stand, yet when he, with his peculiar knowledge of facts remains silent, or has evidence in his power by which he may repel or rebut such proven facts and inferences, and chooses not to avail himself of it, he must suffer the con-

sequences of whatever the facts and inferences adduced against him tend fairly and reasonably to prove."

WADE, Justice.

I concur in the result and generally with the reasons of the prevailing opinion.

I do not agree that the evidence would sustain a verdict of first-degree murder under the willful, deliberate, malicious and premeditated killing category but would not sustain a second degree murder verdict as an included offense thereto. The difference between these two degrees of murder under this category might be only that to find first degree murder the jury must be convinced that there was a cold deliberate planning to kill, whereas to find second degree murder they might feel that there was a reasonable doubt that the killing was planned in cold blood. The effect of the reasoning in the prevailing and concurring opinions is to require the defendant to produce evidence to establish that doubt, whereas the law requires the evidence to remove all such doubt before a first degree verdict is justified. Where, as in this case, second degree murder may be found on the same evidence as first degree murder except that the jury doubts the existence of the element which distinguishes the two degrees, then the court may not refuse to submit both degrees to the jury. To do so is to determine as a matter of law that the jury can have no reasonable doubt on that one element only. If this may be done why may we not hold that the jury can have no reasonable doubt on any of the elements of guilt and direct a verdict against the defendant if the evidence were strong enough?

For another reason, however, I agree that this error was not prejudicial. Our statute makes murder committed in the perpetration or attempt to perpetrate a robbery first degree murder. Under this category there is no included

second degree murder for if the jury doubts that the killing occurred in the perpetration or attempt to perpetrate a robbery, second degree murder does not necessarily follow. Here the evidence which tends to show an unjustified killing planned in cold blood shows it to have been part of a plan to obtain decedent's property from his person or immediate presence by force and therefore that it was murder committed in the perpetration of a robbery.

LATIMER, Justice.

I concur in the result.

My reasons for affirming the judgment are for the most part based upon the principles set forth in my dissenting opinion in *State* v. *Trujillo*, 117 Utah 237, 214 P. 2d 626.

This happens to be another case in which I believe the trial judge correctly applied the law to the facts developed during the trial. The evidence introduced was sufficient to establish beyond a reasonable doubt that the killer deliberately, wilfully, and maliciously brutally assaulted the deceased, either with intent to kill or with intent to do great bodily harm. The jury was properly instructed on both possibilities. To argue that the jury could consider robbery as a motive for the killing overlooks two important facts. First, the trial court eliminated the issue of killing in the perpetration of a robbery and this ruling is the law of the case until reversed. Second, if the intent to rob or dispose of the body and effects to prevent detection was formed after the assault it could not legally affect the prior intent of the killer.